# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Carballido*, 2011 IL App (2d) 090340

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUAN CARBALLIDO, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-09-0340 |
| Filed | March 17, 2011 |
| Modified upon<br>denial of rehearing | August 10, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The summary dismissal of defendant's *pro se* postconviction petition alleging that his counsel was ineffective in failing to pursue a motion to suppress incriminating statements he made to the police was reversed, where the trial court failed to apply the appropriate standard when it went beyond a limited stage-one analysis and weighed various factors in concluding that defendant's statements were voluntary. |
| Decision Under<br>Review | Appeal from the Circuit Court of Lake County, No. 04-CF-3218; the Hon. Theodore S. Potkonjak, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Gary R. Peterson and Michael H. Vonnahmen, both of State Appellate Defender's Office, of Springfield, for appellant. |
| | |
| | Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer and Sally A. Swiss, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

| Panel | PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion. |
| | Justices Hudson and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Juan Carballido appeals the trial court's first-stage dismissal of his *pro se* postconviction petition. 725 ILCS 5/122-1 *et seq*. (West 2008). For the reasons that follow, we reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3     Our background discussion is focused on those facts relevant to defendant's postconviction petition, particularly those facts relevant to defendant's claim that trial counsel was ineffective for failing to file a motion to suppress. However, further details of the underlying offense and procedural history may be found in *People v. Carballido*, No. 2-06-0397 (2007) (unpublished order under Supreme Court Rule 23).

¶ 4     On March 18, 2005, a jury found defendant guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2004)), under an accountability theory. Defendant, age 17 at the time of the offense, drove the car to and from the scene where Eduardo Perez, age 21 and a member of the Latin Kings gang, allegedly shot and killed the 15-year-old victim, Terreal Gates, whom Perez believed to be associated with the Gangster Disciples gang. In sentencing defendant to 35 years' imprisonment, the trial court acknowledged defendant's youth and comparatively minor criminal history (*i.e.*, possession of tobacco by a minor, truancy, and disorderly conduct), but placed great emphasis on the seriousness of the offense, the involvement of a gun, and the need to deter others. Perez was at large and believed to be in Mexico at the time of defendant's sentencing. The only other passenger in the car, Alvaro Jasso, pleaded guilty to felony mob action and received 30 months' probation and 9 months in work release in exchange for testifying against defendant.

¶ 5     The State's case largely turned on establishing that defendant *knew* that Perez possessed a gun when he drove Perez to the Greenleaf Apartments, known to be Gangster Disciples

territory. A witness to the shooting, John Hood,[1] testified that he pulled into the Greenleaf apartment complex after work, around 4 p.m. He saw defendant, whom he recognized as an acquaintance of his younger brother, driving a black Lumina. He also saw Gates and several of Gates' cousins in a green minivan. Both vehicles were moving slowly, and the occupants were yelling at one another (defendant later testified that he made at least four loops around the parking lot). The minivan stopped, and Gates and two or three others got out. Then the Lumina stopped, slowly reversed, and stopped again. Hood did not think to take cover at this point, because his assessment of the situation was that it was "just kids yelling." However, Perez exited the Lumina, pulled a gun, and fired shots. Defendant waited for Perez to get back in the vehicle before fleeing. Hood followed defendant's vehicle to get the plate number, which he was able to punch into his cellular phone. When Hood returned to the parking lot, the green minivan was gone (as Gates' cousin was using it to drive Gates to the hospital).

¶ 6                                              A. Interview

¶ 7        After the shooting, the police arrived at defendant's family home. According to Detective Andrew Jones, it was before 2 a.m. Jones informed defendant that they were investigating a homicide and that witnesses had placed defendant at the scene. In response, defendant stated that he had not expected things to become so serious. According to Jones, Jones interrupted defendant at that point and orally advised him of his *Miranda* rights. Defendant agreed to accompany the police to the station for questioning.

¶ 8        Jones testified that, while in the squad car, defendant provided his first explanation of what happened, beginning with why he drove to the Greenleaf Apartments. Defendant said that members of the Gangster Disciples gang had threatened him the day prior to the incident. That day, a carload of Gangster Disciples followed defendant home. Defendant, who was with his sister Lucy (age 14 at the time of trial), pulled into his driveway but did not exit the vehicle. The Gangster Disciples "rolled" by his house and yelled threats and "dropped" gang signs. Once the Gangster Disciples drove out of sight, defendant grabbed Lucy, ran inside, and locked the doors. Then, the vehicle that had followed him returned, this time accompanied by a second vehicle. Both vehicles stopped by defendant's house and the occupants again dropped gang signs and yelled threats at him. Eventually, both cars left. Defendant explained to Jones that, although he was not a gang member, many of his friends were members of the Latin Kings, a rival gang of the Gangster Disciples. The Gangster Disciples' threats caused defendant to be overcome with fear and anger. As a result, defendant told Perez, a Latin Kings member, about the Gangster Disciples' threats. Defendant later drove Perez to the Greenleaf apartment complex, where Perez produced a handgun and fired at a group of people in a van (*i.e.*, Gates and his cousins) whom defendant assumed to be affiliated with the Gangster Disciples. Defendant insisted that he did *not* know that Perez had a handgun prior to the shooting. Rather, defendant maintained that he thought they were going to stir up less serious trouble, such as a fistfight. After the shooting,

---

[1]Both parties present Hood as a relatively neutral witness.

defendant drove to a park, and Perez exited the vehicle. Defendant then drove home and locked his car in the garage.

¶ 9    Defendant arrived at the police station at approximately 2 a.m. There, he was taken to an interview room, where he read and signed a preprinted *Miranda* form. Defendant repeated his first version of events to police officers Jones and Wendell Russell (who did *not* testify at trial). He formalized this version of events in a written statement. He began the written statement at 2:30 a.m., accepted a Pepsi at 2:40 a.m., and took a bathroom break at 3:10 a.m.

¶ 10    Jones reviewed defendant's written statement. At 3:40 a.m., Jones and Russell resumed their interview with defendant. This time, according to defendant's testimony at trial and as is his position in his postconviction petition, Jones used a higher-pressure interview technique, causing defendant to change his story to say that he *did* know that Perez had a gun.

¶ 11    Regarding the manner in which Jones interviewed defendant after 3:40 a.m., defendant testified:

"A. [They] come back and tell me that they had a problem. After they had read the [first written] statement, they were telling me that I was lying to them.

Q. They had a problem?

A. Yes.

Q. Or had a problem with your statement?

A. Yes.

Q. Or actually, all three statements [*i.e.*, the two oral statements and the one written statement] you had given?

A. Yes.

Q. What was the problem?

A. After I had told them I didn't know about the gun, they were saying I was lying to them. After I explained it about three times to them, I had written it down on a piece of paper, they still wouldn't go with it.

Q. Were both of them in the room telling you that?

A. Yes.

Q. And how long did they tell you that?

A. About 20 minutes [*i.e.*, between 3:40 a.m. and 4 a.m.].

Q. At some point, do you say: I knew he had a gun?

A. Yes.

Q. Why did you say that?

A. Because they wouldn't leave me alone if I told them I didn't know he had a gun. I was exhausted. I didn't know he had a gun. I had written it for them to leave me alone. That's what they wanted to hear. I just came up with that.

* * *

Q. Do they ask you whether you knew [Perez] was going to shoot anybody with the

-4-

gun?

A. Yes.

Q. Did they ask you that question directly?

A. Yes.

Q. What do you say?

A. I said yes.

Q. Why did you do that?

A. Because they wouldn't leave me alone after I had told them that I didn't know about the gun.

Q. You had told them you didn't know about the gun, right?

A. Yes.

Q. When they are asking you whether or not you knew he was going to shoot somebody, you said yes, is that right?

A. Yes.

Q. Why would you do that?

A. Because at that time, I was tired. I was exhausted. I wasn't thinking right. Anything that came to my mind just came out.

* * *

Q. *** [W]hen [Detectives] Jones and Russell came back in and went over your first written statement with you, it's your testimony they started to swear at you, correct?

A. Yes.

Q. They started to raise their voice with you, correct?

A. Yes.

Q. It was Detective Russell who began to swear at you?

A. Jones.

Q. It was Detective Jones. The six-foot four, 350 pound detective started yelling and screaming at you?

A. Yes.

Q. That had to intimidate you.

A. He just started swearing at me; telling me after he had read the statement and I had read it, he was telling me that I was lying; that I was full of bullshit.

Q. And according to you, he elevated his voice?

A. Yes."

Following this line of questioning, defendant completed a second written statement, wherein he stated that he knew that Perez had a gun when he drove Perez into Gangster Disciples territory. The second written statement provided in its entirety:

"Basically we were at my house and [Perez] showed me the pistol and I did not ask for no help or didn't say anything to shoot nobody [but he said] that we got yo back Bro

-5-

we going to get those niggas."

¶ 12    Also at trial, defendant's father, Alfredo Carballido,[2] testified that he had tried to speak with his son while his son was in custody, but that the police denied him access:

"A. [At the house, after defendant was placed in a squad car] I ask [the officer] to explain to me. This was the second time, and I wanted to know what was going on. He didn't give me any explanation at all.

Q. Do you know where your son is going?

A. When they took him, they went to Waukegan, and I was following them [in a car].

* * *

Q. Did you ask anyone there in Waukegan to see your son?

A. I arrived in the office, the Waukegan office. I knocked the door. One officer passed in his car, and he asked me can he help me. And then I told him that I was coming to see our son; that they came from home. A person came out, and I think it was an officer, and I told him that I wanted to know about my son, and he told me–

* * *

He told me my son was in big trouble. I told him I wanted to know, and he said, I am not going to give you any explanation at all.

* * *

Q. Did anyone allow you to see your son that night?

A. No.

Q. Did you talk to your son by telephone that night?

A. No.

Q. Did you see him the next day?

A. No.

Q. Did you talk to him the next day?

A. No.

Q. Did you attempt to call the police the next day?

A. I called back several times.

Q. Did you speak to anyone?

A. I never have an answer from him.

Q. That would have been the day of the 28th, is that right?

A. I tried Saturday, Sunday. There was 72 hours until they give me an answer.

Q. You had no contact with him during that time you just described?

A. No."

¶ 13    Jones, on the other hand, testified that he did not yell or swear at defendant. However,

---

[2]Alfredo Carballido testified primarily in English, but he utilized a Spanish-speaking translator at various points in his testimony.

he acknowledged that there was no recording of the interview (or of his demeanor during that interview). Jones conceded that he had access to both video and audio recording equipment when he interviewed defendant. He explained, however, that the law at that time did not require that defendant's interview be recorded and he did not believe that recording the interview was necessary. According to Jones, after 3:40 a.m., defendant changed his story to say that he first saw the gun at around 2:30 p.m. at his house on the day of the incident. He described the gun as a black revolver. He held it in his hand but did not know the caliber. When Jones asked defendant what they were going to do with the gun, defendant said that they were going to shoot someone. Perez and the Latin Kings were very upset that the Gangster Disciples had followed defendant home the previous evening. Perez told defendant that they were "going to get those niggers and that they had his back." Defendant knew that the Gangster Disciples congregated by the Greenleaf Apartments.

¶ 14        At trial, defendant testified as follows to his version of events. On the day of the shooting, he was home with his older sister, Paula, while she styled hair for two family friends. At around 2 p.m., Paula left for work and defendant remained at home alone. Shortly thereafter, Perez "paged" defendant to pick him up. Perez asked defendant to drive him to North Chicago because Perez wanted to talk to a person named Young Buck. Defendant did not know Young Buck, but he recognized the name. When Perez went inside to talk to Young Buck, defendant stayed in the car and talked on the phone to a female friend with whom he had an upcoming dance date. When Perez returned to the car, defendant did not ask him what he talked about with Young Buck; rather, defendant remained on the phone. Next, defendant drove to a McDonald's restaurant. Then, he went home to check on his sister Lucy (who was expected home at that time), and Perez remained in the car. Defendant and Perez then drove to a nearby park where they met up with four boys whom defendant knew from school. One of the boys, Alvaro Jasso, got in defendant's car and they listened to music. Perez got out of the car and talked with the other boys. Defendant was about to give Jasso a ride home, but then Perez jumped back in the car and told defendant to drive to the Greenleaf Apartments. Defendant had not planned to go to the Greenleaf Apartments until Perez jumped into the car. However, once they began to drive to the Greenleaf Apartments, defendant knew that they would be looking for Gangster Disciples. Defendant drove around the Greenleaf parking lot a couple of times until he spotted Gates and his cousins. Then, defendant, Perez, and Jasso began yelling swear words and "throwing" gang signs at them. Defendant believed that they were doing this to "get them pissed off." He testified that he did not know that Perez had a gun. When defendant drove past Gates' group, Perez asked him to stop and back up. Defendant did so slowly. Perez then got out of the car and began to shoot. Defendant initially was scared that he himself was shot. Perez then got back in the car and defendant drove away. Defendant drove home, but he did not allow Perez or Jasso in the house. Perez and Jasso fled. Then, defendant told his sister Lucy what had happened.

¶ 15                            B. Lucy's Testimony

¶ 16        At trial, the State called Lucy to testify as to what defendant told her. She stated that defendant told her that "he had picked [Perez] up and gave him a ride to North Chicago around where Young Buck lives. And they went to a park, and after they were at a park they

went to the Greenleaf Apartments, and there was a shooting." Lucy described defendant as acting "nervous," "shaky," and "quiet." Defendant told Lucy that he was scared, and he told Lucy to stay away from the windows and to keep the shades closed.

¶ 17 The State asked Lucy, "Did you tell the police officer what [defendant] talked to you about?" Lucy answered, "Yes." The State then asked, "And did you tell the police officer that [defendant] told you when *they went to North Chicago with [Perez] and picked up a gun from a person named [Young] Buck*? You did not tell the officer that?" and Lucy answered, "No."[3] (Emphasis added.)

¶ 18 On cross-examination, the defense attempted to elicit the context in which Lucy volunteered information to Officer Dempsey, the officer who had interviewed her, regarding the gun. Lucy testified that she heard the officer ask her father if he could search the family home for a gun. Hearing this prompted her to come forward to tell the officer "about Young Buck."

¶ 19 The State then called Dempsey for the purposes of "impeaching" Lucy, likely because she answered "no" to the State's above-quoted question. The defense objected to Dempsey's testimony, stating that the State was trying to impeach its own witness (Lucy), but the court overruled the objection. Dempsey testified that Lucy told him that defendant told her that defendant "drove [Perez] to North Chicago to get a gun from a gentleman named Young Buck."

¶ 20 During cross-examination, Dempsey stated that he took handwritten notes *during* his interview with Lucy. He still had the notes in his office. He did not turn them over during the discovery process. Instead, he submitted a written report, which he drew up sometime *after* the interview with Lucy. Dempsey again testified as to what Lucy told him. However, this time he stated, "*they* [*i.e.*, Perez and defendant] went to North Chicago and got a gun from someone named Young Buck." (Emphasis added.) The defense then responded, "[Lucy] said '*they*'?" (Emphasis added.) Dempsey replied, "Yes." The defense then showed Dempsey a copy of his written report, and Dempsey acknowledged that his report did not specify whether Lucy had told him that (1) Perez *and defendant* picked up a gun from Young Buck; *or* (2) Perez alone picked up a gun from Young Buck. Dempsey further conceded that Lucy never stated whether defendant actually saw Young Buck.

¶ 21                                    C. Initial Motion to Suppress

¶ 22 Prior to trial, defendant's trial counsel filed a motion to suppress the statements to police, but he never caused the motion to be heard before the court. At a pretrial conference, counsel stated, "At this time we are going to withdraw the motion. We are not going to proceed on the motion to suppress statements. I am not going to say more now other than that we discussed it."

¶ 23 In the motion, counsel had requested that the court conduct a pretrial hearing to

---

[3]It is unclear why Lucy answered "no" to this (somewhat confusing) question. Later, on cross-examination, she acknowledged telling Officer Dempsey from where Perez likely got the gun.

determine whether the statements: (1) were in violation of *Miranda*; (2) were involuntary; or (3) were the result of an unlawful detention in violation of *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (stating that a determination of probable cause must generally be determined within 48 hours to pass constitutional muster). In the motion, counsel requested that the court suppress evidence of any and all communications, confessions, statements, admissions, or tests, whether inculpatory or exculpatory, written or oral, made by defendant.

¶ 24        The first two issues, whether the statements were given in violation of *Miranda* and, particularly, whether the statements were involuntary, are relevant to the instant postconviction petition. As to whether the statements were given in violation of *Miranda*, the motion set forth that defendant made incriminating statements (*i.e.*, placing defendant at the scene of the crime, etc.) resulting from pre-*Miranda* interrogation in that, under the circumstances (where defendant was taken from his home in the middle of the night, was placed in a squad car, and divulged some information before any warnings were given), Jones's oral warnings given from memory failed to convey a "real choice" between talking and remaining silent.[4] As to whether the statements given were involuntary, the motion generally set forth that defendant's later statement, wherein he admitted that he knew that Perez had a gun, was the result of "psychological and mental coercion."

¶ 25                                        D. Direct Appeal on Motion to Suppress

¶ 26        On direct appeal, defendant argued that trial counsel was ineffective for failing to pursue the motion to suppress his inculpatory statements made as a result of defective *Miranda* warnings. Defendant argued that, pursuant to *Duckworth v. Eagan*, 492 U.S. 195 (1989), an individual receiving *Miranda* warnings must be informed not only of his or her right to remain silent, but also that he or she has a right to cease speaking or request a lawyer at any time. The State did not dispute that defendant was not expressly informed that he had the right to cease speaking once he had begun. Indeed, the preprinted *Miranda* warnings that defendant signed stated:

"1. You have the right to remain silent.

2. Anything you say can be used against you in court or other proceedings.

3. You have the right to talk to a lawyer for advice *before* we ask you any questions, and to have him/her with you during questioning.

4. If you cannot afford a lawyer, one will be appointed to you, free of any cost to you, *before* any questioning if you wish." (Emphases added.)

Defendant essentially contended that he did not realize he could terminate the questioning *after* he had begun and that, had he known he had this right, it was "highly probable" that he would have exercised it.

¶ 27        This court rejected defendant's reading of *Duckworth*, stating that the Court in

---

[4]Defendant later filed an amended motion to suppress, which set forth that Jones did not provide *Miranda* warnings until they had arrived at the police station.

*Duckworth* acknowledged merely that the warnings given there met *Miranda*'s requirements, not that all of the warnings given (including the right to cease speaking or request a lawyer after the questioning had begun) were now required. *Carballido*, slip order at 13. As a result, this court determined that defendant's *Miranda* warnings were not defective. *Id.*

¶ 28                    E. Postconviction Claim on the Motion to Suppress

¶ 29    On November 5, 2008, defendant filed a *pro se* postconviction petition. In it, defendant again argued that his trial counsel was ineffective for failing to pursue the motion to suppress. This time, defendant argued more generally that his confession was involuntary, citing to a multitude of factors–his youth, his arguably low intelligence, his physiological condition at the time of questioning ("exhausted"), and the police yelling and interference with parental contact–rather than to the narrow issue of whether defendant received proper *Miranda* warnings. The trial court found that defendant's claim was not barred by *res judicata*, because the issue considered by this court on direct appeal was a narrower question than the one raised in the postconviction petition.

¶ 30    Nevertheless, on January 21, 2009, the trial court summarily dismissed defendant's postconviction claim that trial counsel was ineffective for failing to pursue a motion to suppress on the basis that defendant's statements to police were not voluntary. In its written order, the court stated that it was "mindful that it is inappropriate to resolve factual questions at the first stage of a postconviction proceeding." The court recounted the trial record, stating that it was doing so only for the purpose of establishing whether the allegations of the postconviction petition were contradicted by the record. The court acknowledged that: (1) the record "provides support for the finding that the police frustrated the attempts of [defendant's] father to speak to [defendant] during questioning"; (2) the police questioned defendant persistently; and (3) defendant's testimony that he was "sleepy and exhausted" during the accusatory portion of the police questioning was "objectively supported" by the fact that defendant was questioned in the early morning hours without an opportunity to sleep that night.

¶ 31    Despite the above-listed factors, the court found that the "uncontradicted facts" in the trial record show that defendant's statements *were* voluntary, especially considering that: (1) "the fact that [defendant's] father was not allowed to speak to [defendant] [was] offset by the fact that defendant never asked that he be allowed to speak with his father"; (2) the fact that defendant's father was prevented from speaking with defendant should be given minimal weight in the instant case because defendant was "nearly 18" and "nothing in the record indicates he was less mature than could be expected for a person of his age or that he was unduly susceptible to coercion"; (3) the questioning as a whole was rather short, defendant was treated well and had a long break before the accusatory portion of the questioning began, and the accusatory portion of the questioning lasted only 20 minutes; (4) the officers' use of shouting and profanity should not have had a coercive effect on defendant, because defendant cannot claim to be unaccustomed or especially sensitive to the use of profanity where he testified at trial that he himself used profanity at the scene of the shooting; (5) defendant did not testify at trial that the officers' use of profanity caused him any distress; and (6) trial

counsel's statements at the sentencing hearing, made in the context of defendant's rehabilitative potential, that defendant was "slow" and had difficulty with reading and math did not prove defendant's postconviction claim that he had a learning disability (and was therefore disadvantaged in understanding the import of his statements). The trial court concluded:

> "[T]he court finds that [defendant's statements to police] were voluntary. Accordingly, the counsel['s] decision not to pursue a motion to [suppress] was not objectively unreasonable. [Defendant's] claims of ineffective assistance are without merit."

This appeal followed.

¶ 32                          II. ANALYSIS

¶ 33                      A. Motion to Suppress

¶ 34    In his postconviction petition, defendant argues that his trial counsel was ineffective for failing to pursue the motion to suppress his statements to police, based on the totality of the circumstances. A defendant has a sixth amendment right to effective assistance of counsel. *People v. Taylor*, 237 Ill. 2d 356, 374 (2010). We review claims of ineffective assistance according to the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) (adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984)), which requires a defendant to show both that: (1) as determined by prevailing professional norms, counsel's performance fell below an objective standard of reasonableness; and (2) the defendant was prejudiced by counsel's deficient performance.

¶ 35    Under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)), a defendant may collaterally challenge his conviction or sentence based on federal or state constitutional violations. The Act limits the scope of a defendant's challenge to constitutional matters that have not been, and could not have been, previously adjudicated. *People v. Rissley*, 206 Ill. 2d 403, 412 (2003). The State contends, and defendant seems to agree, that, in order to avoid having forfeited his claim of ineffective assistance of *trial* counsel, defendant must establish that his *appellate* counsel (who also represented defendant on his motion for a new trial) was ineffective for failing to argue that trial counsel was ineffective for failing to pursue a motion to suppress based on the voluntariness of defendant's statements.

¶ 36    Here, appellate counsel *did* argue, though on a narrower basis, that trial counsel was ineffective for failing to pursue a motion to suppress. Apparently, he thought it was the *Miranda* aspect of the ineffective-assistance claim that was best supported by the trial record and could, conceivably, prove meritorious on direct appeal without further development of the record. Appellate counsel can work only with the record as it exists. See, *e.g.*, *People v. Bew*, 228 Ill. 2d 122, 135 (2008) (where the record on direct appeal is insufficient to establish ineffective assistance of counsel, defendant may bring and develop the claim in a postconviction proceeding). For this reason, we will restrict any further consideration of the voluntariness of defendant's statements to the question of whether *trial* counsel was ineffective for failing to pursue a motion to suppress based on the totality of the circumstances.

¶ 37    Except in cases where the death penalty has been imposed, the Act establishes a three-stage process for adjudicating a postconviction petition. *People v. Jones*, 213 Ill. 2d 498, 503 (2004). At the first stage, the trial court must review the petition within 90 days of its filing to determine whether it is either frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2008). If the trial court determines that the petition is either frivolous or patently without merit, it must dismiss the petition in a written order. *Id*. A *pro se* postconviction petition is frivolous or patently without merit if it has "no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition has no basis in law when it is based on an "indisputably meritless legal theory," meaning that the legal theory is "completely contradicted by the record." *Id*. A petition has no basis in fact when it is based on "fanciful factual allegation[s]," meaning that the factual allegations are "fantastic or delusional." *Id*. at 17. If the court does not dismiss the petition as frivolous or patently without merit, then the petition advances to the second stage. *Id.* at 10. We review *de novo* a trial court's first-stage dismissal. *Id.* at 9.

¶ 38    *Pro se* petitions should be read with a lenient eye, allowing borderline cases to proceed to stage two. *Id*. at 21. While a *pro se* defendant might be aware of the facts underlying his claim, it is unlikely that he will be aware of the precise legal basis for his claim or of the legal elements of his claim. *People v. Edwards*, 197 Ill. 2d 239, 245 (2001). It is for this reason that he need present only the "gist" of a constitutional claim to survive the first stage of the postconviction proceedings. *Id*.

¶ 39    We note that the trial court summarily dismissed defendant's *pro se* postconviction petition prior to the Illinois Supreme Court's release of *Hodges*, which, as cited above, reemphasized the liberal standard with which such petitions are to be evaluated. In any event, the trial court did not evaluate defendant's petition under the appropriate standard.

¶ 40    At the dismissal stage of a postconviction proceeding, all well-pleaded facts not positively rebutted by the original trial record are taken as true. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). Here, defendant asserted that, based on several factors such as age, fatigue, police interference with parental contact, etc., his statements were not voluntary and his trial counsel therefore should have filed a motion to suppress. The trial court stated that it examined the record to determine whether defendant's postconviction allegations were positively rebutted by the record. However, despite its assertions to the contrary, the trial court went beyond the limited stage-one analysis and *did* weigh each of the various factors against one another, ultimately concluding that defendant's statements must have been voluntary. For example, the court stated, "[T]he fact that [defendant's] father was not allowed to speak to [defendant was] offset by the fact that defendant never asked that he be allowed to speak with his father." This statement does not demonstrate reliance on the record for the purpose of positively rebutting defendant's assertion; a hypothetical example of proper reliance on the record at stage one would be if the record showed that defendant *did* speak with his father. The court also assessed defendant's general character and personality, stating, "nothing in the record indicates [that defendant] was less mature than could be expected for a person of his age or that he was unduly susceptible to coercion." Each of these statements indicates that the court strayed from answering the limited stage-one questions of whether defendant's claim was frivolous or patently without merit and whether the record

-12-

positively rebutted defendant's assertions; rather, it stepped into the role of fact finder. The court's weighing of evidence is appropriate at the third stage of a postconviction proceeding, where the court has an evidentiary hearing on the specific issue at hand.

¶ 41    Here, mindful of the relatively low threshold to survive a first-stage dismissal, and taking defendant's allegations as true so long as they are not positively rebutted by the record, we find that defendant raised the "gist" of a claim that his counsel was objectively unreasonable for failing to pursue a motion to suppress based on the totality of the circumstances. In determining whether a defendant's statements were voluntarily made, a court must look to the totality of the circumstances. *People v. Armstrong*, 395 Ill. App. 3d 606, 624 (2009). The court looks to the defendant's age, education, background, experience, mental capacity, and intelligence, as well as the defendant's physical and emotional condition at the time of questioning, the duration of the questioning, and the police treatment of the defendant. *Id*. Additionally, where a young defendant is being prosecuted *outside* of the Juvenile Court Act of 1987 (705 ILCS 405/5-405 (West 2008)), it is proper for the court to consider the common-law "concerned adult factor" in determining the voluntariness of the defendant's statements. *People v. Westmorland*, 372 Ill. App. 3d 868, 884-85 (2007) (17-year-old defendant). Some courts have gone so far as to hold that when a young defendant's parent is present, requests to see his or her child, and is prevented from doing so by police, the presumption arises that the young defendant's will was overborne. See, *e.g.*, *People v. Griffin*, 327 Ill. App. 3d 538, 540 (2002) (First District) (15-year-old defendant prosecuted as an adult in a murder case).

¶ 42    Here, many relevant factors were known to trial counsel when he chose not to pursue a motion to suppress: (1) defendant's youth; (2) defendant's likely fatigue, considering that he gave his statements in the early morning hours following a night without sleep; and (3) police prevention of parental contact. Moreover, trial counsel had notice to further explore other factors that are not necessarily rebutted by the record, such as: (1) defendant's intelligence and the tandem issue of whether he truly understood his constitutional rights; (2) defendant's maturity and the tandem issue of whether he was unduly susceptible to coercion; and (3) whether the police treated defendant in a coercive manner. For example, counsel stated at sentencing that defendant was "slow" and had difficulty with reading and math. The trial court found that this did not establish that defendant had a learning disability (and therefore would have had difficulty understanding his constitutional rights and the import of his statements). However, as noted above, it is not defendant's burden to establish at the first stage that he had a special impediment to understanding his rights or that he was unduly susceptible to coercion–the point is that, so long as the record does not rebut defendant's assertion, it must be taken as true. Likewise we disagree with the trial court's summary assessment that the facts establish *as a matter of law* that police did not treat defendant in a coercive manner. The police had the ability to record defendant's interrogation, but they declined.[5]

---

[5]Though not required at the time of defendant's 2004 interrogation, we consider the lack of the recording to be relevant to the totality of the circumstances surrounding defendant's interrogation. See *People v. Buck*, 361 Ill. App. 3d 923, 945 (2005) (whether a defendant's

-13-

¶ 43    As mentioned above, this court rejected on direct appeal defendant's argument that a motion to suppress would have been successful based on an alleged deficit in defendant's *Miranda* warning, but that decision does not bar this court from considering in a postconviction proceeding the broader question of whether a motion to suppress would have been successful based on the broader allegation that defendant's statements were involuntary, nor does it bar this court from considering the adequacy of defendant's *Miranda* warnings as a part of this broader question. Certainly, the failure to properly warn a defendant pursuant to *Miranda* may, in and of itself, provide a basis for suppressing a defendant's statement to police. However, even if arguable "imperfections" in defendant's *Miranda* warnings would not warrant suppression on that basis alone, imperfections in a defendant's *Miranda* warnings should still be *considered* in determining the voluntariness of a defendant's statement, particularly as those imperfections may have affected the defendant's ability to understand his or her constitutional rights and as they likely speak to the totality of the circumstances surrounding the defendant's custodial experience and his ultimate statement. Here, the State did not dispute that defendant was not expressly informed that he could cease speaking once he began. Therefore, this factor may be considered in subsequent evaluations of defendant's postconviction petition.

¶ 44    Finally, we understand that a trial attorney's decision to abandon a motion to suppress is typically considered a matter of strategy. *People v. Mabry*, 398 Ill. App. 3d 745, 752-53 (2010) (trial counsel *not* ineffective where, after viewing the videotaped interrogation and "presumably" speaking to witnesses, counsel selected only what he believed to be the most viable grounds upon which to base the motion to suppress, rather than including every single ground suggested by the defendant). Here, we have only trial counsel's statement that he knew the reasons he was withdrawing the motion to suppress. Taking defendant's allegations as true at this stage, the motion to suppress had a "reasonable, if not high, probablility of success." *People v. Marshall*, 399 Ill. App. 3d 626, 636 (2010); *cf. People v. Orange*, 168 Ill. 2d 138 (1995) (the case upon which the State relies, where the court affirmed a *second*-stage dismissal where defense counsel, *in a deposition*, explained his strategic reasons for declining to pursue a motion to suppress). A successful motion to suppress had at least a reasonable probability of changing the outcome of this case because, without defendant's statements, the State would have been without direct evidence that defendant *knew* that Perez had a gun–the lynchpin of the State's entire case.

---

interrogation was recorded is a circumstance to be considered in determining the weight to be given to the defendant's statement (citing *People v. Richmond*, 341 Ill. App. 3d 39, 55-56 (2003) (same))). Beginning in 2005, "[a]n oral, written, or sign language statement of an accused made as a result of a custodial interrogation at a police station or other place of detention shall be *presumed* \*\*\* *inadmissible* as evidence against the accused in any criminal proceeding brought under [certain sections of the Criminal Code of 1961, including first-degree murder] unless \*\*\* an electronic recording is made of the custodial interrogation." (Emphasis added.) 725 ILCS 5/103-2.1(b) (West 2008) (added by Pub. Act 93-517, § 25 (eff. Aug. 6, 2003)). The presumption of inadmissibility can be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances. 725 ILCS 5/103-2.1(f) (West 2008).

-14-

¶ 45          B. Notes From the Interview With Lucy: Failure to Disclose

¶ 46          Having determined that, based on the motion-to-suppress issue, the trial court should not have summarily dismissed defendant's petition and the petition in its entirety may proceed to the second stage, we need not address defendant's remaining allegations. Nevertheless, we briefly discuss defendant's discovery-violation issue because it too raises the "gist" of a constitutional claim, and we wish for the lower courts, state prosecutors, and public defenders, as well as investigative personnel, to be aware of proper discovery protocol.

¶ 47          Defendant argues that trial counsel and appellate counsel were ineffective because they failed to argue that he was entitled to a new trial because the State (inadvertently or not) failed to turn over certain police notes, thereby violating his constitutional right to a fair trial. As authority, defendant cites Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001). Illinois Supreme Court Rule 412 states:

"[T]he State shall, upon written motion of defense counsel, disclose to defense counsel the following information within its possession or control:

(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements." Ill. S. Ct. R. 412(a) (eff. Mar. 1, 2001).

¶ 48          Although defendant does not mention it, because this is a first-stage case, we take the liberty of noting that section 114-13(b) of the Code of Criminal Procedure of 1963 also provides legal authority for defendant's claim. That section states:

"Any public investigative, law enforcement, or other public agency responsible for investigating any homicide offense or participating in an investigation of any homicide offense, other than defense investigators, shall provide to the authority prosecuting the offense *all* investigative material, including but not limited to reports, memoranda, *and field notes*, that have been generated by or have come into the possession of the investigative agency concerning the homicide offense being investigated. *** Every investigative and law enforcement agency in this State shall adopt policies to ensure compliance with these standards." (Emphases added.) 725 ILCS 5/114-13(b) (West 2008).

¶ 49          A failure to disclose evidence (as required by Rule 412 and section 114-13(b)) might violate a defendant's due process rights where the State, regardless of motive, fails to disclose evidence that is material to the guilt or innocence of the defendant after the defendant has made a request for the production of that evidence. *People v. Wilken*, 89 Ill. App. 3d 1124, 1128 (1980) (quoting *People v. Nichols*, 63 Ill. 2d 443 (1976)).[6]

_____

[6]Both the trial court and the State characterize the alleged discovery violation as a *Brady* issue. See *Brady v. Maryland*, 373 U.S. 83 (1963). This is not *quite* accurate. Under *Brady*, the State violates a defendant's due process rights if it fails to disclose to the defendant, either willfully or

¶ 50    Here, Dempsey failed to provide the State with the field notes from his interview with Lucy. The State, therefore, did not have the opportunity to review the notes and determine whether there was additional discoverable material contained in the notes beyond what was contained in Dempsey's report. We remind the State of its affirmative obligation under Supreme Court Rule 412(f) that "[t]he State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." Ill. S. Ct. R. 412(f) (eff. Mar. 1, 2001).

¶ 51    Lucy and Dempsey each testified for the State as to the substance of that interview without the defense having access to Dempsey's field notes from that interview. Lucy's testimony and Dempsey's "impeachment" thereof is generally confusing because it is unclear, through two layers of hearsay, whether each respective witness asserts that: (1) defendant told Lucy that he knew *prior to the shooting* that Perez acquired a gun from Young Buck; *or* (2) defendant told Lucy that he realized, *after the shooting had taken place and upon review of the day's events*, that Perez must have acquired the gun from Young Buck. In any case, both parties *characterize* Dempsey's testimony as intimating that Lucy was not being truthful in her assertion that defendant merely provided her with a time-line of the day's events (apparently to warn her of a potential retaliation for the shooting) but that defendant did not tell her one way or the other whether he had prior knowledge that Perez had a gun. Whether Perez acquired a gun *without defendant knowing* is a central question in this case. In failing to ensure compliance with section 114-13(b) and Rule 412, the State and the investigators denied the defense access to the field notes wherein the State's witness (Dempsey) believes he recorded Lucy's statement that defendant told her that he knew prior to the shooting that Perez had a gun.

¶ 52    We make no suggestion that the State or the investigators engaged in any intentional misconduct. However, section 114-13(b) and Rule 412 impose mandatory obligations that are intended to prevent surprise and avoid situations such as the one presented here. On remand, the State is directed to ensure compliance with section 114-13(b) and Rule 412 so that it can fulfill its discovery obligations prior to any further proceedings on defendant's petition.

¶ 53                    III. CONCLUSION

¶ 54    For the aforementioned reasons, we reverse the trial court's judgment and remand for defendant's postconviction petition to proceed to stage two.

¶ 55    Reversed and remanded.

---

inadvertently, *exculpatory* evidence that is material to guilt or punishment. *Id.* at 87. Here, defendant is arguing that the State failed to disclose *inculpatory* evidence, *i.e.*, evidence that tends to lessen the credibility of a witness who testified favorably for defendant.