2021 IL App (2d) 190241-U
No. 2-19-0241
Order filed February 19, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 10-CF-1621 |
| | ) | |
| RICARDO JAIMES, | ) | Honorable |
| | ) | Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's postconviction claim that his trial counsel was ineffective for failing to present expert testimony on eyewitness identifications was frivolous and patently without merit.

¶ 2    Following a jury trial, the defendant, Ricardo Jaimes, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) and attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1), (West 2010)), and sentenced to a total of 70 years' imprisonment. In 2018, the defendant filed a *pro se* postconviction petition alleging that his trial counsel was ineffective for failing to call an expert to testify about the reliability of eyewitness identifications. The circuit court

summarily dismissed the petition as frivolous and patently without merit. The defendant appeals from this order. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4     We restate the evidence established at the defendant's bench trial largely as set forth in our disposition resolving the defendant's direct appeal. *People v. Jaimes*, 2014 IL App (2d) 121368. On June 23, 2010, the defendant and his brother Isaac were charged by indictment with the first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2010)) of Demarkis Robinson and the attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2010)) of William Patrick. The trial court granted the defendant's motion to sever the brothers' trials.

¶ 5     Between September 24 and 27, 2012, the trial court conducted a jury trial. The State's evidence established that Patrick had prior convictions of mob action and possession of a firearm without a firearm owner's identification (FOID) card and that he was a member of the Insane Unknowns street gang, which was a rival of the Latin Kings. Robinson was his close friend and also a member of the Insane Unknowns.

¶ 6     On May 27, 2010, Patrick, his aunt, Wanda Perez, and Robinson were visiting Patrick's grandmother's house at 1129 6th Avenue in Rockford. While Patrick, Robinson, and Perez were on the front porch with other family members, Perez noticed a gray Tahoe sport utility vehicle (SUV) quickly approach and then stop near the 8th Street and 6th Avenue intersection. Perez told Patrick and Robinson to watch the SUV. The driver's side of the vehicle was facing the house. Perez and Patrick noticed the driver make a hand gesture with two fingers pointing downward. Perez did not closely view the vehicle's occupants. Patrick explained that the hand gesture was an act of disrespect to the Insane Unknowns. Patrick then observed the driver display a gang sign for the Latin Kings. Patrick testified that the driver's hand gestures were grounds to start a fight.

¶ 7    Thereafter, Patrick and Robinson left Patrick's grandmother's house. The Tahoe had traveled toward 7th Street, but Robinson and Patrick walked toward 9th Street. Patrick and Robinson passed through an alley and turned onto 5th Avenue. When they exited the alley 15 to 20 minutes after first seeing the Tahoe, Patrick, while speaking on his phone, saw the Tahoe, with the same driver, pass them very slowly. Patrick observed that the passenger had a bandana around his face, which signified to Patrick that the occupants of the Tahoe were going to start shooting. Patrick picked up a brick and threw it at the Tahoe so that it would keep moving. Geraldine Horton was walking by as this occurred. She heard glass break and saw the SUV stop a few feet before a stop sign. Lacressa Dangel was driving by as this occurred. Dangel felt and saw something hit the back of her car on her northbound journey along 9th Street. She stopped her car north of 5th Avenue and saw a silver SUV facing west on 5th Avenue. She observed the scene unfold through her rearview mirror.

¶ 8    Patrick, Horton, and Dangel watched as: (1) the Tahoe's passenger door opened; (2) a passenger exited and walked toward the back of the vehicle; and (3) the passenger used two hands to hold, point, and fire a firearm four or five times. Dangel believed that the gun looked like a skinny BB gun and that the shooter was a Hispanic male. Patrick believed that the firearm looked like a rifle, and he heard five to eight shots fired. He ducked behind a tree, and Robinson veered off into an alleyway. At trial, Horton described both the driver and the passenger as Hispanic.

¶ 9    Shortly after Robinson and Patrick left, Perez heard what sounded like one close gunshot. She then called Robinson's father, Samuel, and told him that she heard a gunshot and that Robinson and Patrick had been walking toward his house. In response to the phone call from Perez, Samuel ran toward the area where the shots were fired. About 15 to 20 minutes later, Samuel found Robinson near the scene. Samuel saw that Robinson was in and out of consciousness and he called

911. Robinson told Samuel, "that damn Richard shot me." From a previous discussion with his son, Samuel had learned that Richard and Robinson had been in a fight at Rockford East High School, Richard was a Latin King who attended that school, and Robinson had encountered Richard at Perez's mother's house a month before the shooting.

¶ 10 Police officers responded to the scene and discovered five spent .22-caliber shell casings in the street. Robinson was transported to Swedish American Hospital, where he was pronounced dead.

¶ 11 Dr. Mark Peters performed an autopsy on Robinson. Dr. Peters opined that Robinson died of a gunshot wound to the abdomen that caused internal bleeding, hemorrhagic shock, and blood loss. Though such an injury could cause instant death, a person could walk and live with such an injury for 30 minutes before dying. Dr. Peters recovered from Robinson's body a bullet that appeared consistent with .22-caliber ammunition.

¶ 12 On May 28, 2010, Patrick spoke to Rockford police officers about the incident and gave his statement. He was upset, shaking, and crying. In his statement, Patrick did not mention that he threw a brick at the silver Tahoe or that Robinson walked up to the vehicle and spoke to the occupants. Though he had not seen the driver before, Patrick knew that the driver was a Latin King, based upon the display of the Latin Kings' gang sign. From a photo array, Patrick identified the defendant as the driver of the Tahoe and Isaac as the shooter. On that same day, Rockford police officers interviewed Dangel. Dangel identified Isaac as the shooter, but she was not able to identify the driver of the vehicle.

¶ 13 On May 29, 2010, the police arrested both the defendant and Isaac. The police discovered the defendant's Tahoe at the house where he was arrested. When the Tahoe was inspected, the police found a spent .22-caliber casing under the rear passenger seat.

¶ 14    Patrick and Perez subsequently identified the defendant's Tahoe as the one they saw on the day of the shooting.  Both Horton and Dangel told the police that the defendant's Tahoe looked like the one involved in the shooting.

¶ 15    Illinois State Police forensic scientist David Welte compared the five spent cartridges found on the street with the one found in the Tahoe.  He concluded that all six casings were fired from the same .22-caliber firearm. Although he determined that the bullet recovered from Robinson was the same caliber as the six casings, he could not determine if it was fired from the same firearm, because, as the firearm used in the shooting was never recovered, he was not able to compare it to that firearm.

¶ 16    On February 7, 2011, Patrick went to the office of the defendant's attorney, David Vella. He was accompanied by someone who identified himself as a Vice Lord from Chicago.  Patrick told Vella that the written statement he had given to the police was false.  He told Vella that he could not identify the driver or the shooter, because hoods and masks covered their faces.  At trial, Patrick testified that his statement to Vella was false and that he had made it because he had been threatened.

¶ 17    In September 2012, Patrick told an assistant State's Attorney that he did not want to testify. Patrick explained that people had threatened him.  He was concerned about his safety.  Patrick indicated that he could still identify the driver of the Tahoe from a photo array, but not the shooter. (At trial, he testified that he could identify the shooter as well.)  Patrick also made no reference to Robinson talking to the occupants of the Tahoe.  (At trial, he testified that Robinson and the occupants said a couple of words when the vehicle first pulled up.)

¶ 18    The State introduced evidence that the defendant was a Latin King.  The State also introduced testimony from an expert on street gangs, who explained the significance of gang members' hand gestures and their rivalries with other gangs.

¶ 19    Following the denial of his motion for a directed verdict, the defendant presented two witnesses.  Rockford police officer Courtney Tillman Listhrup, a school liaison officer at East High School, testified that on May 14, 2010, Isaac complained to her that someone had broken the driver's-side and rear windows of his Chevy Suburban.  Officer Jeffrey Schroeder was called to impeach Patrick's testimony by identifying the differences between Patrick's statements given in May 2010, and September 2012.

¶ 20    At the close of the trial, the jury found the defendant guilty of first-degree murder and attempted first-degree murder.  Following the denial of his posttrial motion, the trial court sentenced the defendant to a total of 70 years' imprisonment.  The defendant thereafter filed a timely notice of appeal.

¶ 21    On direct appeal, the defendant argued that the evidence was insufficient to convict him, the trial court erred in allowing evidence of his past gang activity, and trial counsel was ineffective for eliciting evidence in support of the State's case.  *Jaimes*, 2014 IL App (2d) 121368 ¶¶ 24, 36, 48, 61.  This court affirmed the defendant's conviction and sentence.  *Id.* ¶ 69.

¶ 22    On December 3, 2018, the defendant filed a *pro se* postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122 *et seq.* (West 2018)).  The defendant argued, in relevant part, that trial counsel was ineffective in failing to call an expert on the reliability of eyewitness identifications at trial to challenge Patrick's testimony that the defendant was the driver of the vehicle at the scene of the shooting.  Further, the defendant asserted that appellate counsel was ineffective in failing to raise this issue on direct appeal.

¶ 23    In support, the defendant attached an affidavit from Geoffrey Loftus, a psychology professor at the University of Washington in Seattle.  In his affidavit, Loftus stated that, at over 400 trials worldwide, he had been found qualified to testify as an expert in memory and perception. Loftus stated that expert testimony on eyewitness identifications can help a jury assess the reliability of an eyewitness memory.  Loftus further opined that a number of things could have affected the reliability of Patrick's eyewitness identification, such as multiple factors competing for his attention at the time of the shooting, the short duration of the event, the inaccuracy of cross-racial identifications, and the stress of the event.  Further, post-event factors such as the line-up procedures and other suggestive information could also have influenced Patrick's eyewitness testimony.

¶ 24    On February 28, 2019, the trial court dismissed the petition as frivolous and patently without merit.  The trial court found that, due to the state of the case law at the time of the defendant's trial, the defendant could not establish that his trial counsel's performance was deficient.  Specifically, the trial court found that the defendant could not establish that the failure to call an expert witness on the reliability of eyewitness identification was not the result of reasonable professional judgment or overcome the presumption that such decision was the result of sound trial strategy.  Because the defendant could not establish ineffective assistance of trial counsel, the trial court concluded that the defendant could also not establish ineffective assistance of appellate counsel.  The defendant filed a timely notice of appeal from this order.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, the defendant argues that the trial court erred in summarily dismissing his postconviction petition at the first stage.  The defendant contends that he presented the gist of a constitutional claim that his trial counsel was ineffective in failing to present expert testimony

regarding the fallibility of eyewitness identifications and that appellate counsel was ineffective in not raising this issue on direct appeal. The defendant asserts that this type of expert testimony was particularly relevant in this case because the defendant made no inculpatory statements and Patrick's testimony suffered from numerous flaws.

¶ 27    Postconviction proceedings contain three stages. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). At the first stage, the circuit court, within 90 days of the petition's filing, determines, taking the allegations as true, whether the petition is frivolous or is patently without merit. *Id.* If the court does not summarily dismiss the petition as frivolous or patently without merit, the petition advances to the second stage, where counsel may be appointed, and the State is allowed to file a motion to dismiss. *Id.* If the petition advances to the third stage, the court will hold an evidentiary hearing. *People v. Edwards*, 197 Ill. 2d 239, 270 (2001).

¶ 28    Because most petitions at the first stage are drafted by defendants with little legal knowledge, the threshold for survival is low. *People v. Torres*, 228 Ill. 2d 382, 394 (2008). To survive summary dismissal, a *pro se* petitioner need only raise the "gist" of a constitutional claim. *People v. Coleman*, 183 Ill. 2d 366, 380 n. 2 (1998). The "gist" standard is a low threshold, and to meet this standard, the petition need only set forth a limited amount of detail and need not include formal legal arguments or citations to legal authority. *Edwards*, 197 Ill. 2d at 244. A *pro se* postconviction petition can be dismissed as frivolous or patently without merit when it has "no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition lacks an arguable basis either in law or in fact when it is based on an indisputably meritless legal theory or a fanciful factual allegation. *Id.* A trial court's first-stage dismissal is reviewed *de novo*. *People v. Carballido*, 2011 IL App (2d) 090340, ¶ 37.

¶ 29    An allegation of ineffective assistance in a postconviction petition is considered under the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). To prevail on a claim of ineffective assistance under *Strickland*, a defendant must show both that counsel's performance was objectively unreasonable and that the deficient performance resulted in prejudice to the defendant. *Hodges*, 234 Ill. 2d at 17. The consideration of an ineffective-assistance claim in the postconviction context is slightly different, in that, to survive the first stage of postconviction review, the petition must allege that (1) it is arguable that counsel's performance fell below an objective standard of reasonableness, and (2) it is arguable that the defendant was prejudiced by the deficient performance. *Id.*

¶ 30    In the present case, the trial court did not err in summarily dismissing the defendant's postconviction petition. The defendant's trial occurred in 2012. At that time, Illinois case law generally precluded expert testimony on the reliability of eyewitness identification because such testimony was viewed as invading the province of the jury as the trier of fact. *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 54 (citing *People v. Enis*, 139 Ill.2d 264, 286-87 (1990) (citing cases)). In fact, the *McGhee* court noted that it was "unaware of *** any Illinois cases in which an attorney ha[d] been deemed ineffective for failing to offer, or a trial court has been found to have abused its discretion for refusing to allow, expert testimony on [eyewitness identifications]." *Id.* ¶ 55.

¶ 31    We acknowledge that since *McGhee*, our supreme court held, in *People v. Lerma*, 2016 IL 118496, ¶ 27, that the trial court abused its discretion in granting the State's motion *in limine* to bar the testimony of an expert on the reliability of eyewitness identifications. In *Lerma*, the trial took place at some point between the charged offense, which occurred in 2008, and the time the defendant was sentenced in 2012. *Id.* ¶¶ 3, 5. The *Lerma* court acknowledged that, at the time of

the defendant's trial, expert testimony on the reliability of eyewitness identifications was being routinely excluded, partly because of skepticism previously expressed by the supreme court. *Id.* ¶ 24 (citing *Enis*, 139 Ill. 2d at 286-87). In determining that the trial court abused its discretion in barring the proffered testimony, the *Lerma* court recognized that expert testimony on the reliability of eyewitness identifications had "moved from novel and uncertain to settled and widely accepted." *Id.*

¶ 32    Nonetheless, the issue in the present case is distinct from that in *Lerma*. Whether a trial court abused its discretion in rejecting proffered expert testimony is a different question than the one presented here, namely, whether defense counsel's performance was objectively unreasonable based on the failure to call an expert witness at trial. "Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel." *People v. West*, 187 Ill. 2d 418, 432 (1999). It is well settled "that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). A mistake in trial strategy or an error in judgment will not render representation constitutionally defective. *Id.* at 355-356. "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *Id.*

¶ 33    In the present case, in light of the prevailing case law at the time of the defendant' trial—cautioning against the use of expert testimony on eyewitness identifications—and the deference owed on matters of trial strategy, trial counsel's failure to procure such expert testimony did not arguably fall below an objective standard of reasonableness. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 38 ("Representation based on the law prevailing at the time of trial is adequate,

and counsel is not incompetent for failing to correctly predict that the law will change."); see also *People v. Lawson*, 2020 IL App (1st) 161789-U[1] (affirming first stage dismissal of postconviction petition because trial counsel's failure to call an expert witness on eyewitness identifications could not be considered objectively unreasonable); *People v. Sauseda*, 2018 IL App (1st) 151344-U (holding, on direct appeal, that trial counsel's failure to call an expert witness on eyewitness identifications was not unreasonable); *McGhee*, 2012 IL App (1st) 093404, ¶ 55 (affirming second stage dismissal of postconviction petition, holding that it was not unreasonable for defense counsel to decline to present expert testimony regarding the reliability of eyewitness identification because Illinois courts, in practice, rejected such evidence). Trial counsel was entitled to consider that expert testimony on eyewitness identifications was routinely rejected. Further, as a matter of trial strategy, counsel was entitled to consider that presenting such an expert witness could be met with a counter-expert, who could have bolstered the accuracy of Patrick's eyewitness identification. *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005) ("Counsel's failure to call an expert witness is not *per se* ineffective assistance, even where doing so may have made the defendant's case stronger, because the State could always call its own witness to offer a contrasting opinion."). Trial counsel could also have considered that there were many other bases to attack the reliability of Patrick's testimony as he was a gang member, had prior convictions, and had at one point recanted his identification of the defendant as the driver. Trial counsel did in fact vigorously challenge the reliability of Patrick's testimony at trial on these bases.

---

[1] "This court may rely on the reasoning in a nonprecedential decision because nothing in the language of Illinois Supreme Court Rule 23(e) prevents a court from doing so." *People v. Ingram*, 2020 IL App (2d) 180353, ¶ 21 n.1.

¶ 34    In addition, there is no arguable basis for concluding that the defendant was prejudiced by trial counsel's failure to call an expert witness. Because of the prevailing law at the time, it was common practice to deny motions to admit expert testimony on the reliability of eyewitness identifications. *People v. Young*, 2020 IL App (4th) 180456-U (affirming denial of petition for leave to file a successive postconviction, holding that the defendant could not establish prejudice because, even if trial counsel had moved to admit expert testimony on the reliability of eyewitness identifications, it was common practice at the time to deny such requests). Further, the defendant's conviction did not rest entirely on Patrick's eyewitness identification. There was also other evidence relevant to the defendant's guilt: Dangel identified the defendant's brother as the shooter; Perez, Dangel, and Horton identified the defendant's car as similar to the car involved in the shooting; a shell casing found in the defendant's car matched the casings found at the scene of the crime; and Samuel testified that Robinson stated that "Richard" had shot him. Moreover, even after *Lerma*, it still remains the law in Illinois to use the *Biggers* factors (*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)) for the purpose of assessing the reliability of eyewitness identification testimony. *Macklin*, 2019 IL App (1st) 161165, ¶ 22. This court addressed these factors on direct appeal and held that they supported a determination that Patrick's identification testimony was reliable. *Jaimes*, 2014 IL App (2d) 121368, ¶¶ 30-35. In light of the foregoing, there is no reasonable probability that the result of the defendant's trial would have been different if trial counsel had presented expert testimony concerning the reliability of eyewitness identifications. As there is no arguable merit to the defendant's claim that his trial counsel was ineffective for failing to present such testimony, the trial court did not err in summarily dismissing the defendant's postconviction petition.

¶ 35                                    III. CONCLUSION

¶ 36    For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

¶ 37    Affirmed.