# Illinois Official Reports

## Appellate Court

---

### *People v. Carballido*, 2015 IL App (2d) 140760

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUAN CARBALLIDO, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-0760 |
| Filed | December 15, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 04-CF-3218; the Hon. Mark L. Levitt, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Thomas C. Brandstrader, of Chicago, for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Lawrence M. Bauer and Aline Dias, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Justices McLaren and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1     We reverse the trial court's third-stage denial of defendant's postconviction petition. 725 ILCS 5/122-1 *et seq.* (West 2014). It is beyond reasonable dispute that defendant made a substantial showing of a constitutional violation pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). The State failed to disclose the field notes of an investigating officer, as required by law. 725 ILCS 5/114-13(b) (West 2014); Ill. S. Ct. R. 412(a) (eff. Mar. 1, 2001). If the defense had been given access to the field notes prior to trial, it would have been able to impeach the officer on the central issue in this case: defendant's foreknowledge of the gun used in the offense. Defendant's knowledge of the gun was critical to the State's shared-intent theory of accountability. Looking at this discovery violation in the context of the entire case, including: (1) the high relevance of the suppressed evidence; (2) additional errors stemming from and surrounding the discovery violation, such as the introduction of hearsay and improper closing argument; and (3) a significant dispute over the reliability of other key evidence against defendant, *i.e.*, defendant's inculpatory statement, we do not have confidence in the integrity of the verdict. It is reasonably probable that, if the defense had been given access to the field notes prior to trial, the outcome of the trial would have been different. Separately, we note that, though not reversible in itself, the trial court's improper exclusion of testimony contributes to our lack of confidence that defendant received due process of law.

¶ 2                            I. BACKGROUND

¶ 3     Our background discussion is focused on those facts relevant to defendant's postconviction petition, particularly those facts relevant to defendant's *Brady* claim. However, further details of the underlying offense can be found in *People v. Carballido*, No. 2-06-0397 (2007) (unpublished order under Supreme Court Rule 23), and further details surrounding the first-stage dismissal of defendant's petition can be found in *People v. Carballido*, 2011 IL App (2d) 090340. In fact, much of our background discussion is taken from the latter case.

¶ 4              A. Overview of the Crime and Neutral Witness Accounts

¶ 5     On March 18, 2005, a jury found defendant guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)), under an accountability theory. Defendant, age 17 at the time of the offense, drove a car to and from the scene where Eduardo Perez, then age 21 and a member of the Latin Kings gang, allegedly shot and killed the 15-year-old victim, Terreal Gates, whom Perez believed to be associated with the Gangster Disciples gang. In sentencing defendant to 35 years' imprisonment, the trial court acknowledged defendant's youth and comparatively minor criminal history (*i.e.*, possession of tobacco by a minor, truancy, and disorderly conduct), but placed great emphasis on the seriousness of the offense, the involvement of a gun, and the need to deter others. Perez was at large and believed to be in Mexico at the time of defendant's sentencing. The only other passenger in the car, Alvaro Jasso, pleaded guilty to felony mob action and received 30 months' probation and 9 months in work release.

¶ 6     The State's case largely turned on establishing that defendant knew that Perez possessed a gun when he drove Perez to the Greenleaf Apartments, known to be Gangster Disciples territory. A neutral witness to the shooting, John Hood, testified that he pulled into the apartments' parking lot after work, around 4 p.m. He saw defendant, whom he recognized as an acquaintance of his younger brother, driving a black Lumina. He waved to defendant. He

also saw Gates and several of Gates's cousins in a green minivan. He waved to Gates and Gates's cousins. Both vehicles were moving slowly, and the occupants were yelling at one another (defendant later testified that he made at least four loops around the parking lot). The minivan stopped, and Gates and two or three others got out. Then the Lumina stopped, slowly backed up, and stopped again. Hood did not think to take cover at this point, because his assessment of the situation was that it was "just kids yelling." However, Perez exited the Lumina, pulled a gun, and fired shots. Defendant waited for Perez to get back in the vehicle before fleeing. Hood followed defendant's vehicle to get the plate number, which he was able to punch into his cellular phone. When Hood returned to the parking lot, the green minivan was gone (as Gates's cousin was driving Gates to the hospital).

¶ 7 Another neutral witness, Linsie Archer, went to school with defendant and Jasso and with the teenagers in Gates's group. She recognized defendant as the driver, and she recognized Perez as the shooter.

¶ 8 **B. Defendant's Inculpatory Statements as Compared to Defendant's Account at Trial**

¶ 9 **1. Interrogation and Inculpatory Statements**

¶ 10 Detective Andrew Jones testified as follows. He had been assigned to locate and interview defendant. By that time, Jones had already spoken with both Hood and Archer. He believed defendant to have been the driver in the shooting. The morning after the shooting, before 2 a.m., two squad cars parked two houses down from defendant's family home. At least one of the squad cars was unmarked; it was a Crown Victoria without a police logo or cage, but with interior strobe lights. They parked away from the home so that defendant would not see them and come out with a weapon or flee. Additionally, one of the officers stationed himself at the side door so that defendant could not flee. Then, Jones and two other officers knocked calmly on the front door. Defendant's father, Alfredo Carballido, answered the door.

¶ 11 When Jones knocked on the door to defendant's home, he was wearing a Task Force polo shirt, which had a badge embroidered on one side. Additionally, he wore a "tactical cover vest" over his shirt. He had a firearm strapped to his hip. Defendant heard the knocking and came downstairs, in his shorts only. Jones told defendant that he was an officer with the major crimes unit and that he would like to speak with defendant outside about "something they were looking into." Jones allowed defendant to go back upstairs and get dressed before going outside.

¶ 12 Once on the front lawn, Jones told defendant that they were "investigating a serious crime" and "would like to speak with him" back at the police station. Defendant agreed and got into the backseat of the unmarked squad car. Jones sat in the front seat of the car. Another officer, Wendell Russell, sat beside defendant in the back seat.

¶ 13 While in the squad car, *before* giving defendant *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)), Jones told defendant that: (1) they were investigating a shooting at the Greenleaf Apartments; (2) "a number of witnesses" had put defendant at the scene; and (3) they "needed to know what happened and what led up to the incident." Jones initially denied making the third statement, but defense counsel impeached Jones with a quote from Jones's own five-page police report. Jones then admitted making all three statements. He denied, however, that these statements constituted "questions."

¶ 14    To this, defense counsel asked: "Did you not anticipate in your experience as a police officer and investigator that when you asked [defendant] to tell you what happened and what led up to the shooting, that you would be likely to receive an incriminating statement?" Jones explained: "My hope was to elicit a response; *** then[,] if anything incriminating came out, then obviously as I am required to do, cease that statement and advise him of his *Miranda* rights."

¶ 15    Jones elaborated on his understanding of when he was required to give *Miranda* warnings and on his interview technique in general:

> "[DEFENSE COUNSEL]: You wanted to see if he was willing to talk before you gave him his *Miranda* rights?
>
> [JONES]: Yes.
>
> [DEFENSE COUNSEL]: The *Miranda* rights include the right to remain silent?
>
> [JONES]: Absolutely."

And:

> "[DEFENSE COUNSEL]: You didn't tell him [of his *Miranda* rights] until you learned he was willing to talk; is that fair?
>
> [JONES]: That is correct."

¶ 16    Jones acknowledged that defendant made an incriminating statement in response to the prompt for information. That is, defendant admitted his involvement in the offense and presence at the scene by stating that "he had not expected things to become so serious."

¶ 17    Then, according to Jones, Jones interrupted defendant and gave defendant complete oral *Miranda* warnings. According to defendant, however, Jones did *not* give him any oral *Miranda* warning. Defense counsel asked Jones why he did not ask defendant to sign a *Miranda* form at that time. Jones answered that he did not keep the forms in the car. Defense counsel asked Jones whether he kept a note pad and pen in the car. Jones acknowledged that he kept writing supplies in the car but did not ask defendant to sign anything. Finally, defense counsel asked Jones why he chose to interview defendant in the car at all, rather than complete the seven-minute drive to the police station and begin the interview after an official *Miranda* form could be signed. Jones stated:

> "I'm still looking for a gun that was used in the homicide of a 15-year old. I'm still looking for the car that [defendant] owns that we don't even know is on that location yet, so my hope is as he tells us his story, once that story is out, that's my next two questions where can I locate those two items."

¶ 18    Still in the squad car, defendant provided his first explanation of what happened, beginning with why he drove to the Greenleaf Apartments. Defendant said that members of the Gangster Disciples gang had threatened him the day prior to the incident. That day, a carload of Gangster Disciples followed defendant home. Defendant, who was with his sister Lucy (age 14 at the time of trial), pulled into his driveway but did not exit the vehicle. The Gangster Disciples "rolled" by his house and yelled threats and "dropped" gang signs. Once the Gangster Disciples drove out of sight, defendant grabbed Lucy, ran inside, and locked the doors. Then, the vehicle that had followed him returned, this time accompanied by a second vehicle. Both vehicles stopped by defendant's house, and the occupants again dropped gang signs and yelled threats at him. Eventually, both cars left. Defendant explained to Jones that, although he was not a gang member, many of his friends were members of the Latin Kings, a rival gang of the

Gangster Disciples. The Gangster Disciples' threats caused defendant to be overcome with fear and anger. As a result, defendant told Perez, a Latin Kings member, about the Gangster Disciples' threats. Defendant later drove Perez to the Greenleaf Apartments, where Perez produced a handgun and fired at a group of people in a van (*i.e.*, Gates and his cousins) whom defendant assumed to be affiliated with the Gangster Disciples. Defendant insisted that he did not know that Perez had a handgun prior to the shooting. Rather, defendant maintained that he thought they were going to stir up less serious trouble, such as a fistfight. After the shooting, defendant drove to a park, and Perez exited the vehicle. Defendant then drove home and locked his car in the garage.

¶ 19 Defendant told Jones that the car was still in the garage, and he gave the police permission to search it. When officers approached the garage to search the car, Alfredo denied them access. The officers then sought and obtained a search warrant. Jones was aware that, while he talked to defendant in the squad car, another officer talked to Alfredo. Jones acknowledged that it was the officers' intention to keep them separate.

¶ 20 Alfredo confirmed that the police did not allow him to speak with defendant:

"[ALFREDO]: [At the house, after defendant was placed in a squad car] I ask [the officer] to explain to me. This was the second time, and I wanted to know what was going on. He didn't give me any explanation at all.

[DEFENSE COUNSEL]: Do you know where your son is going?

[ALFREDO]: When they took him, they went to Waukegan, and I was following them [in a car].

\* \* \*

[DEFENSE COUNSEL]: Did you ask anyone there in Waukegan to see your son?

[ALFREDO]: I arrived in the office, the Waukegan office. I knocked the door. One officer passed in his car, and he asked me can he help me. And then I told him that I was coming to see our son; that they came from home. A person came out, and I think it was an officer, and I told him that I wanted to know about my son, and he told me–

\* \* \*

He told me my son was in big trouble. I told him I wanted to know, and he said, I am not going to give you any explanation at all.

\* \* \*

[DEFENSE COUNSEL]: Did anyone allow you to see your son that night?

[ALFREDO]: No.

[DEFENSE COUNSEL]: Did you talk to your son by telephone that night?

[ALFREDO]: No.

[DEFENSE COUNSEL]: Did you see him the next day?

[ALFREDO]: No.

[DEFENSE COUNSEL]: Did you talk to him the next day?

[ALFREDO]: No.

[DEFENSE COUNSEL]: Did you attempt to call the police the next day?

[ALFREDO]: I called back several times.

[DEFENSE COUNSEL]: Did you speak to anyone?

[ALFREDO]: I never have an answer from him.

[DEFENSE COUNSEL]: That would have been the day of the 28th, is that right?

[ALFREDO]: I tried Saturday, Sunday. There was 72 hours until they give me an answer.

[DEFENSE COUNSEL]: You had no contact with him during that time you just described?

[ALFREDO]: No."

¶ 21 Defendant arrived at the police station at approximately 2 a.m., where he read and signed a preprinted *Miranda* form. After signing the *Miranda* form, defendant told Jones and Russell the same story that he had told them in the squad car. Jones asked defendant to put his statement into writing. Defendant began the written statement at 2:30 a.m., accepted a Pepsi at 2:40 a.m., and took a bathroom break at 3:10 a.m. Defendant's written statement (including grammatical errors) read:

> "Yesterday in the afternoon I was Driving down the street when I noticed a red Blazer following me for no reason so I started Heading Home and they followed me so they drove by and left then a couple minutes later they came back with another car like Five more people so I was inside cause my little sister was with me I never [k]now what they might be carrying so the day just went by. Now today around noon I picked up my buddy at his house went cruising then came around 3:30 or 4:00 me and my buddy went by greenleaf Apt. and we saw the same guys that followed me and all of a sudden they start to yell out a whole bunch of stuff and throw gang signs when my buddy pulled out a gun from his waist of his pants and just started shooting and I Just took off as Fast as I can not knowing who he hit and then drop[p]ed him off at the park and I went my way and I [*sic*] went his way. Edward Perez is my buddy."

¶ 22 According to defendant, Jones told defendant to add the final line, "Edward Perez is my buddy," so that it would be apparent to whom defendant referred when he used the term "buddy." Indeed, the last line is in a different ink color. Jones denied instructing defendant to add that line. Further, after reading the statement, defendant realized that he had neglected to tell the officers that Jasso had been present in the back seat during the shooting. Although he told them about Jasso at that point, the officers did not ask him to further amend his statement. They then gave defendant a short break.

¶ 23 At 3:40 a.m., Jones and Russell resumed their interview with defendant. This time, according to defendant's testimony at trial and as is his position in his postconviction petition, Jones used a higher-pressure interview technique, causing defendant to change his story to say that he *did* know that Perez had a gun.

¶ 24 Regarding the manner in which Jones interviewed defendant after 3:40 a.m., defendant testified:

> "[DEFENDANT]: [They] come back and tell me that they had a problem. After they had read the [written] statement, they were telling me that I was lying to them.
>
> [DEFENSE COUNSEL]: They had a problem?
>
> [DEFENDANT]: Yes.
>
> [DEFENSE COUNSEL]: Or had a problem with your statement?
>
> [DEFENDANT]: Yes.

[DEFENSE COUNSEL]: Or actually, all three statements[,*i.e.*, the two oral statements and the one written statement] you had given?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: What was the problem?

[DEFENDANT]: After I had told them I didn't know about the gun, they were saying I was lying to them. After I explained it about three times to them, I had written it down on a piece of paper, they still wouldn't go with it.

[DEFENSE COUNSEL]: Were both of them in the room telling you that?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And how long did they tell you that?

[DEFENDANT]: About 20 minutes[,*i.e.*, between 3:40 a.m. and 4 a.m.].

[DEFENSE COUNSEL]: At some point, do you say: I knew he had a gun?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: Why did you say that?

[DEFENDANT]: Because they wouldn't leave me alone if I told them I didn't know he had a gun. I was exhausted. I didn't know he had a gun. I had written it for them to leave me alone. That's what they wanted to hear. I just came up with that.

\* \* \*

[DEFENSE COUNSEL]: Do they ask you whether you knew [Perez] was going to shoot anybody with the gun?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: Did they ask you that question directly?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: What do you say?

[DEFENDANT]: I said yes.

[DEFENSE COUNSEL]: Why did you do that?

[DEFENDANT]: Because they wouldn't leave me alone after I had told them that I didn't know about the gun.

[DEFENSE COUNSEL]: You had told them you didn't know about the gun, right?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: When they are asking you whether or not you knew he was going to shoot somebody, you said yes, is that right?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: Why would you do that?

[DEFENDANT]: Because at that time, I was tired. I was exhausted. I wasn't thinking right. Anything that came to my mind just came out.

\* \* \*

[DEFENSE COUNSEL]: \*\*\* [W]hen [Detectives] Jones and Russell came back in and went over your first written statement with you, it's your testimony they started to swear at you, correct?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: They started to raise their voice with you, correct?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: It was Detective Russell who began to swear at you?

[DEFENDANT]: Jones.

[DEFENSE COUNSEL]: It was Detective Jones. The six-foot four, 350 pound detective started yelling and screaming at you?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: That had to intimidate you.

[DEFENDANT]: He just started swearing at me; telling me after he had read the statement and I had read it, he was telling me that I was lying; that I was full of bullshit.

[DEFENSE COUNSEL]: And according to you, he elevated his voice?

[DEFENDANT]: Yes."

Following this line of questioning, defendant completed a second written statement, wherein he stated that he knew that Perez had a gun when he drove Perez into Gangster Disciples territory. The second written statement provided in its entirety:

"Basically we were at my house and [Perez] showed me the pistol and I did not ask for no help or didn't say anything to shoot nobody [but he said] that we got yo back Bro we going to get those niggas."

¶ 25    Jones, on the other hand, testified that he did not yell or swear at defendant. However, he acknowledged that there was no recording of the interview (or of his demeanor during that interview). Jones conceded that he had access to both video and audio recording equipment when he interviewed defendant. He explained, however, that the law at that time did not require that defendant's interview be recorded, and he did not believe that recording the interview was necessary. Additionally, Jones averred that he did not know how to work the equipment. Defense counsel asked Jones whether much of this controversy concerning tone and word usage could have been avoided had Jones, at a minimum, audio recorded the interrogation. Jones conceded that it could have been.

¶ 26    According to Jones, after 3:40 a.m., defendant changed his story to say that he first saw the gun at his house at around 2:30 p.m. on the day of the incident. Jasso was there. Defendant described the gun as a black revolver. He held it in his hand but did not know the caliber. When Jones asked defendant what they were going to do with the gun, defendant said that they were going to shoot someone. Perez and the Latin Kings were very upset that the Gangster Disciples had followed defendant home the previous afternoon. Perez told defendant that they were "going to get those niggers and that they had his back." Defendant knew that the Gangster Disciples congregated by the Greenleaf Apartments.

¶ 27                          2. Defendant's Account at Trial

¶ 28    At trial, defendant testified to his version of events. On the day of the shooting, he was home with his older sister, Paula, while she styled hair for two family friends. At around 2 p.m., Paula left for work and defendant remained at home alone. Shortly thereafter, Perez "paged" defendant to pick him up. Perez asked defendant to drive him to North Chicago because Perez wanted to talk to a person named Young Buck. Defendant did not know Young Buck, but he recognized the name. When Perez went inside to talk to Young Buck, defendant

- 8 -

stayed in the car and talked on the phone to a female friend with whom he had an upcoming dance date. When Perez returned to the car, defendant did not ask him what he talked about with Young Buck; rather, defendant remained on the phone. Next, defendant drove to a McDonald's restaurant. Then, he went home to check on his sister Lucy (who was expected home at that time), and Perez remained in the car. Defendant and Perez then drove to a nearby park, where they met up with four boys whom defendant knew from school. One of the boys, Jasso, got in defendant's car, and they listened to music. Perez got out of the car and talked with the other boys. Defendant was about to give Jasso a ride home, but then Perez jumped back in the car. Defendant asked Perez why he got in the car. The trial court sustained the State's hearsay objection as to what Perez told defendant. Defendant then began to testify as to why he drove to the Greenleaf Apartments, starting with, "because [Perez] had told me." The State again objected to what Perez said as being hearsay. The trial court again sustained the objection, agreeing with the State that, without revealing what anybody told him, defendant could not testify as to what he thought was going to happen when he went to the apartment complex. Defendant was able to testify that he had not planned to go to the Greenleaf Apartments until Perez jumped into the car. Once they began to drive there, defendant knew that they would be looking for Gangster Disciples. Defendant drove around the parking lot a couple of times. He noticed Hood, the older brother of a friend. Hood waved at him. Then, he spotted Gates and his cousins, including Shawn Cutrer. Defendant recognized Cutrer from school, but he did not recognize anyone in Gates's group as being part of the group that had driven by his house the previous day. Nevertheless, defendant, Perez, and Jasso began yelling swear words and "throwing" gang signs at Gates's group. Defendant believed that they were doing this to "get them pissed off." According to defendant, Gates's group "threw" back opposing gang signs. Defendant testified that he did not know that Perez had a gun. He saw that Perez was wearing a bandanna to cover his face. When defendant drove past Gates's group, Perez asked him to stop and back up. Defendant did so slowly. Perez then got out of the car and began to shoot. Defendant initially was scared that he himself was shot. Perez then got back in the car, and defendant drove away. Defendant drove home, but he did not allow Perez or Jasso in the house. Perez and Jasso fled. Then, defendant told his sister Lucy "what happened." (Defendant did not testify to what, exactly, he told Lucy.)

¶ 29    The State attempted to impeach defendant with his partial silence during the interrogation, implying to the jury that defendant's lack of detail constituted a lack of candor and, even, a lack of truthfulness. Specifically, the State made much of the fact that defendant initially referred to Perez as his "buddy" or, simply, "Edward," and that defendant claimed he did not remember the surname Perez until the police reminded him. (Defendant never denied the accuracy of the surname Perez once it was provided to him.) Additionally, the State noted that it was not until he went over his first written statement with Jones that defendant realized that he had not yet told them about Jasso's presence.

¶ 30    The defense called Jasso for the narrow purpose of corroborating defendant on one point. That is, Jasso stated that he did not go to defendant's house to view the gun prior to the shooting. Rather, he was at work during that time. Jasso's testimony negated the statement defendant made at the end of his police interrogation and was consistent with defendant's account at trial that Perez must have gotten the gun from Young Buck.

¶ 31    The State had earlier called Lucy, for the purpose of eliciting defendant's statements against his interest regarding foreknowledge of the gun. Lucy testified that defendant told her

that "he had picked [Perez] up and gave him a ride to North Chicago around where [Young] Buck lives. And they went to a park, and after they were at a park they went to the Greenleaf Apartments, and there was a shooting." The State also asked the following:

> "[STATE]: Did [defendant] tell you anything about a gun?
>
> [LUCY]: No.

> \* \* \*

> [STATE]: And did you tell the police officer that [defendant] told you when *they* went to North Chicago with [Perez] and picked up a gun from a person named [Young] Buck? You did not tell the officer that?
>
> [LUCY]: No." (Emphasis added.)

¶ 32 During cross-examination, Lucy described defendant as "nervous," "shaky," and "quiet." Defendant told Lucy that he was scared, and he told Lucy to stay away from the windows and to keep the shades closed.

¶ 33 The State called investigator Paul Dempsey for the purpose of impeaching Lucy's statements that defendant did not tell her about a gun or about knowingly obtaining a gun. Outside the presence of the jury, the defense objected to Dempsey's testimony. It argued that the State was trying to impeach its own witness. The court overruled the objection. The defense did not request that the jury be admonished that Dempsey's testimony be used for impeachment purposes only, and the court did not provide an admonishment.

¶ 34 Dempsey testified:

> "Lucy told me that [defendant] told her on the way to pick up her mother from work, that earlier in the day, he drove [Perez] to North Chicago to get a gun from a gentleman named Young Buck. At which time after that, [defendant] drove [Perez] and [Jasso] to some apartments off of Greenleaf and [Perez] shot somebody."

¶ 35 During cross-examination, Dempsey stated that he took handwritten field notes during his interview with Lucy. He still had the notes in his office. He did not turn them over during the discovery process. Instead, he submitted a written report, which he drew up eight days after the interview with Lucy. Dempsey testified:

> "[DEFENSE COUNSEL]: When you wrote your report from your notes, were you quoting Luc[y], or were you summarizing?
>
> DEMPSEY: Regarding?
>
> [DEFENSE COUNSEL]: Regarding your testimony today that she indicated that [defendant] described going to North Chicago with Edward visiting Young Buck.
>
> DEMPSEY: It wasn't verbatim but very close."

¶ 36 Additionally, Dempsey again testified as to what Lucy told him. However, this time he stated, "*they* [(*i.e.*, Perez and defendant)] went to North Chicago and got a gun from someone named Young Buck." (Emphasis added.) The defense then responded, "[Lucy] said '*they*'?" (Emphasis added.) Dempsey replied, "Yes." The defense then showed Dempsey a copy of his written report, and Dempsey acknowledged that his report did not specify whether Lucy had told him that: (1) Perez and defendant picked up a gun from Young Buck; or (2) Perez alone picked up a gun from Young Buck. (The relevant line in the written report stated: "Luc[y] stated [defendant] told her that earlier in the day Edward and him went to North Chicago, IL

and picked up a gun from a person named 'Young Buck'.") Dempsey further conceded that Lucy never stated whether defendant actually saw Young Buck.

¶ 37    In closing, the State acknowledged that defendant's inculpatory statement (that Perez showed Jasso and him a gun in his house before the shooting) was not necessarily consistent with other timelines set forth at trial (that Perez and defendant picked up a gun from Young Buck, then picked up Jasso at the park, then drove to the apartments). It stated that this discrepancy was an example of defendant's inability to give a consistent account of the facts.

¶ 38    The defense responded that defendant did not know what Perez was doing when Perez went inside to see Young Buck. The defense urged that defendant's inculpatory statement concerning foreknowledge of the gun were not reliable, because they were the result of police coercion.

¶ 39    In rebuttal, the State argued that "perhaps most telling is" that defendant himself told Lucy that he obtained a gun from Young Buck:

> "Can you believe anything that that man said? Can you believe that he had no knowledge of what was going on when he picked up the shooter; when he drove the shooter down to North Chicago to Young Buck's, this known Latin King's home? Can you believe him when he said all those things happened; that Perez showed him the gun? That's all in there. It is what it is. We believe the truth is in all of those facts.
>
> Perhaps most telling is what this defendant said to his sister. He and [Perez] went to North Chicago and picked up a gun. [Defendant] told her he drove [Perez] and [Jasso] to some apartments off of Greenleaf to shoot someone. Luc[y] is not a police officer. She is not a gang banger. She is a sister. And the defendant told her exactly what he did.
>
> The tragedy in this case, ladies and gentlemen, is that a 15-year-old boy got out of a van with his cousins and died. Find this defendant guilty. Thank you."

¶ 40    The trial court provided the jury with numerous instructions, including the following:

> "The believability of a witness may be challenged by evidence that on some former occasion, he made a statement that is not consistent with his testimony in this case. Evidence of this kind may be considered by you only for the purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.
>
> However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes, or explains an event or condition the witness had personal knowledge of and the statement was written or signed by the witness or the witness acknowledged under oath that he made the statement."

The jury convicted defendant of first degree murder. The trial court sentenced defendant to 35 years' imprisonment.

¶ 41                              C. Initial Motion to Suppress

¶ 42    Prior to trial, defendant's trial counsel filed a motion to suppress defendant's statements to the police, but he never caused the motion to be heard before the court. At a pretrial conference, counsel stated, "At this time we are going to withdraw the motion. We are not going to proceed on the motion to suppress statements. I am not going to say more now other than that we discussed it."

### D. Direct Appeal: Motion to Suppress

¶ 44      On direct appeal, in addition to many other issues, defendant argued that trial counsel was ineffective for failing to pursue the motion to suppress his statement as a result of defective written *Miranda* warnings. Defendant argued that, pursuant to *Duckworth v. Eagan*, 492 U.S. 195 (1989), an individual receiving *Miranda* warnings must be informed not only of his or her right to remain silent, but also that he or she has the right to cease speaking or to request a lawyer at any time. The State did not dispute that defendant was not expressly informed that he had the right to cease speaking once he had begun. Indeed, the preprinted *Miranda* warnings that defendant signed stated:

> "1. You have the right to remain silent.

> 2. Anything you say can be used against you in court or other proceedings.

> 3. You have the right to talk to a lawyer for advice *before* we ask you any questions, and to have him/her with you during questioning.

> 4. If you cannot afford a lawyer, one will be appointed to you, free of any cost to you, before any questioning if you wish." (Emphasis added.)

Defendant essentially contended that he did not realize that he could terminate the questioning after he had begun and that, had he known that he had this right, it was "highly probable" that he would have exercised it.

¶ 45      This court rejected defendant's reading of *Duckworth*, stating that the Court in *Duckworth* acknowledged merely that the warnings given there met *Miranda*'s requirements, not that all of the warnings given (including of the right to cease speaking or request a lawyer after the questioning had begun) were now required. *Carballido*, slip order at 13. As a result, this court determined that defendant's written *Miranda* warnings were not defective. *Id*.

### E. Direct Appeal: Improper Exclusion of Evidence

¶ 47      Defendant also argued on direct appeal that portions of his trial testimony were improperly excluded. *Id.* at 16-17. Specifically, defendant contended that he should have been allowed to testify as to what Perez told him prior to the shooting, because Perez's statements formed the basis for his state of mind, believing that no shooting would take place. *Id*. The State conceded that, "if defendant's excluded testimony would have included statements that led defendant to believe that a shooting was not going to occur, the trial court would have erred in sustaining [its] hearsay objection." *Id*. at 17. We agreed that an error had occurred, but not a reversible error. *Id*. We noted that defendant had not made an offer of proof. We also noted that defendant had other opportunities to establish his state of mind before the shooting: he testified that he had no plans to go to the Greenleaf Apartments until after Perez got into his car, and he testified that he expected only a fist fight with the Gangster Disciples. *Id*. As such, we concluded that the jury's verdict did not result from the erroneous exclusion of the evidence. *Id*.

### F. *Pro Se* Postconviction Petition

¶ 49      In 2008, defendant filed a *pro se* postconviction petition. In it, defendant argued that the State, inadvertently or not, deprived him of a fair trial when it failed to turn over certain police notes. These notes were Dempsey's field notes regarding his interview with Lucy, wherein

Dempsey claimed to have written that Lucy told him that defendant and Perez obtained a gun from Young Buck.

¶ 50    Defendant also argued that his trial counsel was ineffective for failing to pursue the motion to suppress. This time, defendant argued more generally that his confession was involuntary, citing a multitude of factors–his youth, his arguably low intelligence, his physiological condition at the time of the questioning ("exhausted"), and the officers' yelling and interference with parental contact–rather than raising the narrow issue of whether defendant's written *Miranda* warnings were proper. The trial court found that defendant's claim was not barred by *res judicata*, because the issue considered by this court on direct appeal was a narrower question than the one raised in the postconviction petition. Nevertheless, in 2009, the trial court dismissed defendant's postconviction petition. Defendant appealed the first-stage dismissal.

¶ 51                          G. Stage-One Postconviction Appeal

¶ 52    On appeal, defendant argued that his postconviction petition should have survived the first stage. *Carballido*, 2011 IL App (2d) 090340, ¶¶ 34, 47. We held that defendant raised the gist of a constitutional claim based on the State's discovery violation. *Id*. ¶ 46. That is, the State was required to turn over Dempsey's field notes in advance of trial, and it did not. We characterized the missing field notes as inculpatory, because Dempsey testified that they recorded Lucy's statement that defendant told her that defendant and Perez obtained a gun from Young Buck. Due to our characterization of the evidence as inculpatory, we framed the issue as a general discovery violation rather than as a traditional *Brady* violation. See, *e.g.*, *Brady*, 373 U.S. at 87 (the State violates the defendant's due-process rights if it fails to disclose to the defendant, either willfully or inadvertently, *exculpatory* evidence that is material to guilt or punishment). We cited Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) and section 114-13(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-13(b) (West 2014)) in holding that the State and the investigating authorities had a duty to disclose the field notes. *Carballido*, 2011 IL App (2d) 090340, ¶¶ 47-48.

¶ 53    As to potential prejudice, we stated: "Whether Perez acquired a gun without defendant knowing is a central question in this case. In failing to ensure compliance with section 114-13(b) and Rule 412, the State and the investigators denied the defense access to the field notes wherein the State's witness (Dempsey) believes he recorded Lucy's statement that defendant told her that he knew prior to the shooting that Perez had a gun." (Emphasis omitted.) *Id*. ¶ 51. We stated that the aforementioned authorities impose mandatory obligations that are intended to "prevent surprise and avoid situations such as the one presented here." *Id*. ¶ 52. Further, we directed the State to "ensure compliance with section 114-13(b) and Rule 412 so that it can fulfill its discovery obligations *prior to any further proceedings on defendant's petition*." (Emphasis added.) *Id*.

¶ 54    Additionally, we held that defendant raised the gist of an ineffective-assistance claim based on counsel's failure to pursue the motion to suppress his inculpatory statements. *Id*. ¶ 41. The factors relating to the voluntariness of defendant's statements, if true, gave the motion to suppress a reasonable probability of success. *Id*. ¶ 44. Additionally, a successful motion to suppress had a reasonable probability of changing the outcome of the trial. *Id*.

¶ 56        Defendant's postconviction petition survived the second stage. At the third-stage evidentiary hearing, counsel raised three issues: (1) the discovery violation; (2) ineffective assistance based on the failure to pursue the motion to suppress defendant's statements; and (3) ineffective assistance based on the failure to question Jasso in greater detail so as to elicit that Jasso was surprised by the shooting. We focus on the first issue.

¶ 57        The evidentiary hearing took place over two days, April 16, 2014, and July 9, 2014. The April hearing was intended for evidence and the July hearing was intended for ruling. At the April hearing, the defense presented evidence relating to the ineffective-assistance issues. However, because the State still had not provided the defense with the field notes, the defense was limited to argument on the discovery issue.

¶ 58        The defense argued that it was prejudiced by Dempsey's testimony and failure to turn over the notes:

>        "[The defense] may have been taken aback at the fact that Detective Dempsey said: Well, I took notes while I was talking to her[,] and[,] from those notes, I wrote my police report.
>
>        There are no such notes[,] and, therefore, [trial counsel] was deprived of a significant area of impeachment of Detective Dempsey about a crucial, central issue in the cause.
>
>        I believe that I am safe to say that a *Brady* violation can never be harmless. And this was a *Brady* violation. This was material."

¶ 59        The State argued that the discovery violation was not willful. Next, it argued that defendant was not prejudiced, because he *did* have access to Dempsey's written report prior to trial. Finally, it argued that there was not a reasonable probability that the result of the trial would have been different, because Dempsey's testimony did not constitute substantive evidence:

>        "[T]he purpose of Investigator Dempsey being called, which is readily apparent according to the transcript, was just to impeach Lucy.
>
>        This wasn't something that was substantive evidence; it was just to contradict a denial that Lucy made when she took the stand before. This wasn't something necessarily that Lucy even had personal knowledge of in regards to the actual incident. So–
>
>        The case law is relatively clear that when there is an issue in regards to a nondisclosure of evidence that there has to be a reasonable probability that had this evidence been disclosed to the defense the result of the proceeding would have been different."

¶ 60        At the July hearing, three years after this court ordered it to do so, the State provided the field notes. The assistant State's Attorney recounted that, when first assigned to the case, he contacted Dempsey to ask for the notes. "Dempsey asked which notes." He told him he wanted the notes of the conversation with Lucy. Dempsey provided some notes. The notes did not contain the conversation with Lucy. He then asked Dempsey to send *all* of his notes. In the second tendering, Dempsey again sent no notes about Lucy. Before the April hearing, the State contacted Dempsey for the third time. Dempsey confirmed that these notes existed, but he represented that he already gave them to the State. The State did not have them. In June, Dempsey faxed the State 33 pages of field notes, labeled SMD1 through SMD33. SMD1 is a

fax cover sheet. SMD2 is the written report. SMD3 "purportedly details the interview with Lucy." SMD3 is the only page with Lucy's name on it. The remaining pages, SMD4 through SMD33, detailed other aspects of the investigation.

¶ 61    The State moved to admit SMD1 through SMD33 into evidence. The defense did not object, acknowledging that the critical page, SMD3, appeared to be in Dempsey's handwriting. In its entirety, SMD3 read:

> "Luc[y] C.
> [birthdate]
> [handwritten line]
> Paula
> [birthdate]
> 370
> [handwritten line]
> Alfredo C.
> [birthdate]
> [handwritten line, followed by an arrow from Alfredo's name to the following]:
> Text message 11:31 Fri Aug. 27
> 'Hey come scoop up'
> Cell (847) ***-****
> Edward
> (224) ***-****
> [handwritten line]
> Young
> [handwritten line]
> Skokie Valley Highwood
> 15 Aug 95 [not decipherable]
> 1600-1605"

The defense reviewed SMD3 for the first time. It then argued: "[Trial counsel] should have had that note to impeach Detective Dempsey as to where he got this information that [defendant] went to North Chicago and got a gun." It concluded: "[T]he failure to tender that discovery, the failure to tender that crucial impeachment on the main issue of the case is not a harmless error and it requires in and of itself that the petition be granted and Mr. Carballido be taken, go back to square one and stand trial again without that constitutional error."

¶ 62    The State argued:

> "At this point the notes have been tendered in their entirety. The Court does have these notes, including SM[D]3 which are the notes detailing the questioning of Lucy Carballido by Investigator Dempsey.
>
> * * *
>
>    *** Investigator Dempsey was called to impeach. There is nothing under the law and nothing under 725 ILCS 5/115-10.1 that would allow anything that Investigator Dempsey said to come in as substantive evidence [on] this point.

* * *

*** There is no reasonable probability that had this evidence been disclosed, *** the result of these proceedings would have been different.

* * *

There has been no–and the burden is on the defense. There has been no showing that there's any willfulness behind this nondisclosure that that is necessarily required."

¶ 63 The trial court ruled against defendant. It rejected defendant's due-process claim, noting that the discovery violation was not "due in any part to any type of willful conduct by the State." It stated that it "would only be guessing as to a possible effect on a fact-finder's decision-making." However, it was "clear" to the court that, if the evidence had been available, it would have been used to "impeach a witness as to a very small detail." It concluded that there was no prejudice. It also rejected defendant's ineffective-assistance claims. This appeal followed.

¶ 64                                          II. ANALYSIS

¶ 65 Defendant appeals the third-stage denial of his postconviction petition. To be successful at the third stage and ultimately have his petition granted, a defendant has to make a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). A "substantial showing" is a showing that is "real and weighty" as opposed to "illusory and trivial." *People v. Ward*, 2013 IL App (4th) 120001-U, ¶ 109. We review third-stage fact-finding and credibility determinations under the manifestly-erroneous standard. *Pendleton*, 223 Ill. 2d at 473. Manifest error is clearly evident, plain, and indisputable. *People v. Beaman*, 229 Ill. 2d 56, 73 (2008). Mindful of these standards, here, we hold that it is beyond reasonable dispute that defendant made a substantial showing that his due-process rights were violated pursuant to *Brady*.

¶ 66 In *Brady*, the Supreme Court held that the State violates a defendant's constitutional right to due process if it fails to disclose evidence favorable to the accused and material to guilt or punishment. *Id.* (citing *Brady*, 373 U.S. at 87). A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused, be it either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment. *Id.* at 73-74. Evidence is "material" for the purposes of *Brady* if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed. *Id.* at 74. The standard for materiality for the purposes of *Brady* is borrowed from the standard for prejudice under *Strickland v. Washington*, 466 U.S. 668, 694 (1984). *United States v. Bagley*, 473 U.S. 667, 682 (1985). Under each standard, a "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id*. If *Brady*'s three prongs are satisfied, there is no need to perform a harmless-error analysis. *Kyles v. Whitley*, 514 U.S. 419, 435-36 (1995). This is because, " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,' " it is certain that the discovery violation had a " ' "substantial and injurious effect or influence in determining the jury's verdict." ' " *Id*. at 433-35 (quoting the definitions of materiality and harmless error, as set forth, respectively, in *Bagley*, 473 U.S. at 682, and *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))). In sum, to satisfy *Brady*, the favorable evidence, suppressed by the State, could

reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Beaman*, 229 Ill. 2d at 74.

¶ 67                                        A. The Evidence Was Favorable to Defendant

¶ 68       Under the first prong, it is clear that the undisclosed evidence was favorable to defendant. The nondisclosure resulted in a lost impeachment opportunity. Dempsey's field notes do *not* state that Lucy told him that defendant told her that he knew prior to the shooting that Perez had a gun. This means that, when the defense tried to impeach Dempsey on the potential weaknesses of his written report, drawn up eight days after the actual interview, Dempsey should *not* have been allowed to imply that the written report was reliable because it reiterated the information contained in the contemporaneously transcribed field notes. Dempsey was able to testify unchecked as to the reliability of his recollections:

> "[DEFENSE COUNSEL]: When you wrote your report from your notes, were you quoting Luc[y], or were you summarizing?
>
> [DEMPSEY]: Regarding?
>
> [DEFENSE COUNSEL]: Regarding your testimony today that she indicated that [defendant] described going to North Chicago with [Perez] visiting Young Buck.
>
> [DEMPSEY]: *It wasn't verbatim but very close.*" (Emphasis added.)

The defense lost its opportunity to argue that, because the written report was drawn from memory as to whatever Lucy told Dempsey about Young Buck, it is more likely that Dempsey made a leap in his own mind that Lucy told him that defendant *knew* that Perez got the gun from Young Buck, rather than that defendant later *deduced* that Perez must have gotten the gun from Young Buck. The defense also lost its opportunity to argue that Dempsey's failure to contemporaneously record Lucy's key statement, in any manner, even in shorthand, indicated that it was a fabrication. Dempsey's field notes show that he interviewed Lucy, but they do *not* show that Lucy talked about a gun or about Young Buck. Shining light on the omission in the field notes would have given the jury a basis to question whether Lucy really told Dempsey about defendant's knowledge of the gun. As defendant's knowledge of the gun was a central issue in this case, any evidence challenging his knowledge would be favorable to defendant.

¶ 69       We reject the State's argument that the field notes were not favorable to defendant in that they were merely cumulative of the written report. The field notes contradict Dempsey's assertion that he drew up the written report from the field notes. The defense's impeachment based on the written report was weak. The defense was able to point out that the written report did not *expressly* say that defendant *knowingly* retrieved a gun from Young Buck. However, the written report did say that "[L]ucy stated [defendant] told her that earlier in the day [Perez] and him went to North Chicago, IL and picked up a gun from Young Buck." This statement does not outright contradict Dempsey's testimony that his understanding of Lucy's statement was that defendant knowingly obtained the gun. Moreover, without the field notes, the defense's attempt to impeach Dempsey backfired in part, providing Dempsey with an opportunity to further bolster the reliability of his recollection by telling the jury that his recordings in the report were near verbatim. The field notes would have allowed for a much stronger impeachment. They would have allowed for a general attack on Dempsey's credibility and for argument that Dempsey fabricated Lucy's statement.

¶ 70    We acknowledge a unique aspect of this case: the undisclosed evidence was not *inherently* valuable to defendant.[1] The field notes did not have inherent value as exculpatory or impeaching. The impeachment value of the field notes was not triggered until Dempsey testified in a manner that grossly misrepresented the contents of the field notes. This is in contrast to a typical *Brady* case, where the undisclosed evidence has inherent value as exculpatory or impeaching. For example, in *Beaman,* evidence of an alternative suspect's motive and opportunity had inherent exculpatory value. In *Bagley*, evidence that a $300 reward had been held out to the State's witnesses had inherent impeachment value.

¶ 71    The lack of inherent value does not dissuade us. When it is not clear whether the undisclosed evidence would be favorable, we should presume that it would be favorable. See, *e.g*., *People v. Nichols*, 63 Ill. 2d 443, 448 (1976) (where the prosecution failed to turn over a shoe left at the scene of the crime, presumably belonging to one of the perpetrators, "[t]he shoe must be considered as evidence favorable to the defendants"). But see *id*. at 452 (Underwood, J., dissenting, joined by Ryan and Crebs, JJ.) ("[The shoe's] ownership and whether it would help or hinder defendants [is] totally speculative."). To hold otherwise would discourage the State from disclosing evidence as required. When the State fails to disclose evidence as required, it enables its witnesses to testify inaccurately without check. In this way, it is to be expected that some undisclosed evidence does not acquire its value until a witness testifies inaccurately.

¶ 72    We stress that the evidence does not need to be substantive, as opposed to impeaching, in order to be favorable to a defendant. *Beaman*, 229 Ill. 2d at 73-74 (the undisclosed evidence is favorable to the accused, be it *either exculpatory or impeaching*). The failure to turn over impeachment evidence affecting the credibility of the prosecution's witness implicates a standard *Brady* analysis. *Bagley*, 473 U.S. at 675-77 (remand required to determine the materiality of the State's failure to disclose that a $300 reward had been offered to the State's only two witnesses in connection with their testimony against the defendant). The State has argued throughout the proceedings that we should take the instant discovery violation less seriously because it did not concern substantive evidence. This is not only wrong, but it is disingenuous. As we will discuss below, it is correct that the evidence should not have been used substantively (725 ILCS 5/115-10.1 (West 2014)), but the State itself used the evidence substantively. To whatever extent the trial court here based its ruling on the nonsubstantive

---

[1]In fact, as noted, in our previous opinion, we referred to the field notes as *inculpatory*. We trusted that the notes would say what Dempsey said they would say. As such, we looked to whether it was arguable that the failure to disclose the notes hindered the defense so as to affect the outcome of the trial. *Carballido*, 2011 IL App (2d) 090340, ¶ 49 (citing *People v. Wilken*, 89 Ill. App. 3d 1124, 1128 (1980) (the State's failure to disclose the police report of an officer who was the only nondefendant to place the defendant at the scene of the crime unduly hindered the defendant's due-process right to prepare a defense)).

The undisclosed evidence must be favorable to the defendant in order to trigger a *Brady* analysis. However, a *Brady* analysis is just one type of due-process claim. Whether the evidence was favorable or not and whether the evidence was suppressed by the State or improperly excluded by the court, a defendant's conviction may be reversed where the discovery or evidentiary error materially affected the outcome of the trial. Here, there is no question that the discovery error is properly before us as part of a postconviction claim, because the field notes were outside the trial record and their prejudicial impact did not become clear until the postconviction evidentiary hearing.

nature of the undisclosed evidence, it erred.

¶ 73                    B. The Evidence Was Suppressed by the State

¶ 74      Under the second prong, it is also clear that the evidence was suppressed by the State. The State had an affirmative duty to disclose the field notes. Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) states:

> "(a) *** [T]he State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:
>
>     (i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. ***
>                                  * * *
>     (f) The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession and control all material and information relevant to the accused and the offense charged.
>     (g) Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State, and which is in the possession or control of other governmental personnel, the State shall use diligent good-faith efforts to cause such material to be made available to defense counsel; and if the State's efforts are unsuccessful and such material or other governmental personnel are subject to the jurisdiction of the court, the court shall issue suitable subpoenas or orders to cause such material to be made available to defense counsel." Ill. S. Ct. R. 412(a)(i), (f), (g) (eff. Mar. 1, 2001).

Section 114-13(b) of the Code of Criminal Procedure of 1963 also governs disclosure. That section states:

> "Any public investigative, law enforcement, or other public agency responsible for investigating any homicide offense or participating in an investigation of any homicide offense, other than defense investigators, shall provide to the authority prosecuting the offense all investigative material, including but not limited to reports, memoranda, and field notes, that have been generated by or have come into the possession of the investigating agency concerning the homicide offense being investigated. *** Every investigative and law enforcement agency in this State shall adopt policies to ensure compliance with these standards." 725 ILCS 5/114-13(b) (West 2014).

As the State concedes, it breached its duty to disclose. The State failed to ensure a "flow of information" between investigative agencies and its office. Ill. S. Ct. R. 412(f) (eff. Mar. 1, 2001). It also failed to use "diligent good-faith efforts" to ensure that the material was made available to the defense. Ill. S. Ct. R. 412(g) (eff. Mar. 1, 2001).

¶ 75      Contrary to arguments made by the State at the hearing and seemingly adopted by the trial court, it makes no difference whether the suppression was willful. See *Beaman*, 229 Ill. 2d at 73-74 (the evidence was suppressed by the State *either willfully or inadvertently*). We are concerned with the fairness of defendant's trial. In the context of a due-process claim, the State

is accountable for the actions of police officers. The prosecution has a duty to learn of any favorable evidence known by those acting on the government's behalf, including the police. *Kyles*, 514 U.S. at 437-38. Even if the police fail to inform the prosecution that the evidence exists, the prosecution remains accountable for that omission. *Id*. at 438. "[E]xcusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Id*. To whatever extent the trial court here based its holding upon a consideration of the State's intent, it erred.

¶ 76     Regardless, we are disappointed by the State's minimal effort to comply with its discovery obligations. Upon this court's 2011 order, the State had three years to procure the field notes. The State did not obtain the notes until June 4, 2014. At the July 2014 hearing, the State reported that Dempsey behaved in an evasive manner. However, the record does not show, for example, that the State ever subpoenaed Dempsey's notes. The State had Dempsey's notes by June 4, 2014, but it did not disclose the notes to the defense until July 9, 2014, the day the court was set to rule. This delay put the defense at a disadvantage in that on the day of the court's ruling it had to tweak its closing argument concerning materiality.

¶ 77     The circumstances surrounding the discovery violation in this case highlight a defendant's vulnerability to any lack of compliance by the State. At the April 2014 hearing, the State let the trial court believe that the notes simply did not exist or were lost. The State did not inform the court, as it would at the July 2014 hearing, of its efforts to secure them. Allowing the court to believe that the notes simply did not exist gave the State an advantage *vis-a-vis* the actual content of the notes. This is true even though, when evidence is missing, the court should presume that the evidence is favorable to the defendant. Without seeing the evidence, it is difficult for any court to predict exactly *how* helpful to the defendant the evidence might be. For example, here, if the notes had not existed, the defense could have argued that Dempsey's written report was less reliable because it was written from memory. On the other hand, because the notes *did* exist and affirmatively contradicted Dempsey's testimony that he contemporaneously recorded Lucy's statement in a manner that was "very close" to "verbatim," the defense could have more powerfully attacked Dempsey's general credibility and could have argued that Dempsey fabricated Lucy's alleged statement. Obviously, the preclusion of the latter argument makes for a stronger materiality claim. The State is charged with the pursuit of justice (*People v. Valdery*, 65 Ill. App. 3d 375, 378 (1978)), and, here, defendant's materiality claim is stronger because the State did, albeit late, provide the notes rather than report them as lost. While "better late than never," we cannot condone the State's lax approach to meeting discovery requirements.

¶ 78                                   C. The Evidence Was Material to Guilt

¶ 79     Next, we turn to the third prong, whether defendant was prejudiced because the evidence was material to guilt or punishment. Looking at this discovery violation in the context of the entire case, including: (1) the high relevance of the suppressed evidence; (2) additional errors stemming from and surrounding the discovery violation, such as the introduction of hearsay and improper closing argument; and (3) a significant dispute over the reliability of other key evidence against defendant, *i.e*., defendant's inculpatory statement, we do not have confidence in the integrity of the verdict. Separately, we note that, though not reversible in itself, the

court's improper exclusion of testimony contributes to our lack of confidence that defendant received due process of law.

¶ 80       Dempsey's testimony was highly relevant to the State's case against defendant. There are two distinct accountability theories, shared intent (also referred to as specific intent) and common design. *People v. Fernandez*, 2014 IL 115527, ¶ 21. Here, the State pursued a shared-intent theory, meaning that defendant shared Perez's criminal intent to engage in a shooting, such that defendant would have known about the gun.[2] The main evidence supporting defendant's knowledge of the gun was the latter portion of his inculpatory statement. The defense presented evidence to challenge the reliability of the latter portion of the inculpatory statement, and, so, the State sought to counter that damage by introducing evidence that defendant told Lucy similar information in terms of knowing about the gun. However, Lucy did not testify as the State anticipated. She denied that defendant told her about the gun or told her that he knowingly retrieved it from Young Buck. The State then called Dempsey to impeach Lucy and, in so doing, establish that defendant *did* tell Lucy a story similar to his inculpatory statement. This information was likely highly persuasive to the jury, particularly where, as the State later argued, defendant would have had no motive to provide his sister with a false account against his own interest. Dempsey falsely assured the jury that he contemporaneously recorded Lucy's statement "very close" to "verbatim" and that the information contained in Lucy's statement was similar to defendant's inculpatory statement. The biggest question for the jury was whether defendant knew about the gun, and the jury was likely to resolve this question by assessing the reliability of defendant's inculpatory statement. Dempsey's testimony, which tended to bolster the reliability of defendant's inculpatory statement, was thus highly relevant to the case. The defense could have used the field notes to prevent Dempsey from making inaccurate statements to bolster the reliability of the State's key evidence. Therefore, the field notes had great potential to impact the outcome of the trial.

¶ 81       Additional errors stemming from and surrounding the discovery violation compounded the prejudice to defendant. For example, Dempsey should not have been allowed to impeach Lucy in the first place. Defendant raised this objection at trial. A party may not attack the credibility of its own witness by calling another witness, unless it shows that its original witness affirmatively damaged its case. Ill. R. Evid. 607 (eff. Jan. 1, 2011). Affirmative damage occurs only when a witness gives positive aid to an adversary's case. *People v. Cruz*, 162 Ill. 2d 314, 360 (1994). Affirmative damage does not occur where a party interrogates a witness about a fact that would be favorable to the examiner if true but receives a response that is negative in its effect on the examiner's case. *Id.*

¶ 82       Here, the State questioned Lucy about a fact, defendant's statements about the gun, that would have been helpful if true. However, Lucy denied defendant's statements about the gun. Her answers were merely disappointing. She did not affirmatively damage the State's case. Therefore, the State should not have been allowed to call Dempsey to impeach her.

---

[2]Defendant's knowledge of the gun would not necessarily have been critical to a common-design theory. See *Fernandez*, 2014 IL 115527, ¶ 21. However, as noted, the State did not present that theory to the jury, and it does not present it on appeal. Any attempt to present it on appeal would have been profoundly unfair, in any event. See *People v. Crespo*, 203 Ill. 2d 335, 344-45 (2001) (the State could not change its theory of the case on appeal, because doing so deprived the defendant of the opportunity to defend against that theory at trial and invaded the jury's province to decide questions of fact).

¶ 83 Dempsey's improper testimony then led to the improper use of Lucy's alleged out-of-court statement as substantive evidence. A party may not impart substantive character to prior inconsistent statements under the guise of impeachment. *Id*. at 364. When a court allows improper impeachment, it risks the introduction of hearsay evidence. See, *e.g*., *id*. Hearsay, by definition, is offered to impart substantive information; it is offered for the truth of the matter asserted. Because Dempsey's testimony was not offered properly for impeachment purposes, it was, effectively, hearsay offered for substantive purposes. Again, this was damaging because Lucy's alleged out-of-court statement is corroborative of defendant's inculpatory statement.

¶ 84 During closing argument, the State encouraged the jury to use Lucy's alleged out-of-court statement as substantive evidence:

> "Perhaps most telling is what this defendant said to his sister. He and [Perez] went to North Chicago and picked up a gun. [Defendant] told her he drove [Perez] and [Jasso] to some apartments off of Greenleaf to shoot someone. Lucy is not a police officer. She is not a gang banger. She is a sister. And the defendant told her exactly what he did."

These were the State's near-final words to the jury, and defendant had no opportunity to respond to the improper argument.

¶ 85 We reject the State's suggestion at oral argument that, because the court provided a general limiting instruction, the jury should have understood the proper use for Dempsey's testimony. To begin, there was no proper use for Dempsey's testimony. In any case, courts have long recognized that jurors find it difficult to consider prior inconsistent statements solely to determine credibility and might afford substantive value to even properly admitted impeachment testimony. *Id*. Providing a limiting instruction concerning the testimony's narrow purpose might reduce the risk of a jury affording the testimony substantive value, but, in some cases, it could prove inadequate. *Id*. at 366. Improper impeachment and improper substantive use of that impeachment might combine in a manner that is unduly prejudicial to a defendant even where there was a limiting instruction. *Id*. Here, the court provided only a general limiting instruction, prior to deliberation. The jury did not receive a limiting instruction with specific reference to Dempsey's testimony. We disagree that the court's general limiting instruction cured the prejudice here. Moreover, we find the State's position disingenuous, where it was the party to encourage substantive use of the already improper evidence.

¶ 86 In determining whether the discovery violation and its related errors affected the outcome of the trial, we must consider the rest of the evidence at trial. *Beaman*, 229 Ill. 2d at 78 (evidence of an alternate suspect's motive and opportunity was material where the State's evidence of the defendant's opportunity was strongly disputed); see also *People v. Coleman*, 183 Ill. 2d 366, 396 (1998) ("We simply cannot speculate how the jury might have assessed the credibility of [the four] other witnesses' testimony [all of whom had potential biases, either familial or due to their statuses as suspects or jailhouse informants] had the true nature of [a witness's] lineup statements to police been before it.").

¶ 87 Here, as we have discussed, a large portion of the State's case turned upon the reliability of the latter portion of defendant's inculpatory statement. The defense challenged the reliability of defendant's inculpatory statement. It elicited evidence that defendant was particularly vulnerable to providing a false confession, in that defendant was 17 years old, had no significant criminal history, was interviewed in the middle of the night without getting any sleep, and was not able to talk to his parents. It elicited evidence that Jones and Russell had

used intimidating tactics, in that they conducted at least *some* pre-*Miranda* questioning (while in a closed squad car, telling defendant that witnesses had placed him at the scene and that the officers "needed to know" what happened), interfered with Alfredo's attempts to speak with defendant, and yelled and swore at defendant (and failed to use the available recording equipment that could have resolved the question of their demeanor). Finally, it elicited evidence that aspects of defendant's confession were, indeed, false. Defendant confessed that he knew that Perez had a gun, because Perez showed Jasso and him the gun in defendant's house prior to the shooting. However, Jasso could not have been at defendant's house at that time, because Jasso was at work. Defendant's final account, given after, according to him, the officers yelled at him and intimidated him, differed from his initial response, made before he was given *Miranda* warnings, that he did not "expect things to get so serious," as well as his thrice-told account given in the squad car, in the first written statement, and at trial.

¶ 88 Of course, the jury was not required to subscribe to defendant's reliability argument, and, we infer, it did not. Perhaps defendant's failure to timely tell the police about Jasso caused the jury to form a negative credibility assessment. Perhaps it thought that defendant's backing up the car circumstantially corroborated his inculpatory statement. Still, we must acknowledge that defendant's reliability argument was substantial.

¶ 89 As such, the question for us is whether, but for the discovery violation and the related errors, there is a reasonable probability that the jury would have considered the reliability argument and other evidence in a different light so as to reach a different result. We think so. But for the discovery violation and the related errors, the State would not have been able to bolster the reliability of defendant's inculpatory statement in the manner that it did. It is reasonably probable that, if the defense had been able to prevent Dempsey from testifying that Lucy's statement, recorded "verbatim," was similar to defendant's inculpatory statement, the jury would have considered the entire case in a different light so as to reach a different verdict. This rationale is dispositive.

¶ 90 Separately, however, we note that another improper evidentiary exclusion adds to our lack of confidence that defendant received due process of law. See, *e.g.*, *Beaman*, 229 Ill. 2d at 74 (in making a materiality determination, courts must consider the cumulative effect of all the suppressed evidence, not just each item of evidence individually). The second evidentiary exclusion here was not by the State, but, rather, by the trial court. Still, we consider it as a component of defendant's trial. A *Brady* analysis is, after all, a consideration of whether the defendant received the due process of law to which he is constitutionally entitled. *Id.* at 73.

¶ 91 As discussed *supra* ¶ 47, the trial court erred in limiting defendant's testimony as to his alleged state of mind that no shooting would occur. Defendant could not testify to what Perez told him prior to the shooting. Because of this, it is reasonably probable that defendant was denied the opportunity to effectively counter evidence of Perez's nonverbal cues that a shooting would occur, such as the donning of a bandanna. Defendant was also denied the opportunity to rebut the unlikely scenario that he simply drove Perez to the Greenleaf Apartments without discussion. See, *e.g.*, *People v. Weaver*, 92 Ill. 2d 545, 556 (1982) (the defendant was prejudiced when a witness was not allowed to testify that the defendant discussed a certain topic with her, because, under the circumstances, evidence that the topic had been discussed would have made the defendant's version of events more plausible). The jury might have been more likely to believe defendant if he had been able to explain the *basis* for his state of mind rather than simply recount his state of mind. This evidentiary error did not,

by itself, provide a sufficient ground for reversal, and it is not necessary to our reversal now. Still, we include it in our analysis, because, together with the discovery violation and the related errors, it lessens our confidence in the integrity of the verdict.

### D. Remaining Issues

Based on our resolution of the due-process claim, we need not address defendant's ineffective-assistance claims. We do not, by what he have addressed or declined to address in this opinion, indicate whether, on remand, a motion to suppress statements will or will not be successful. Defendant has not challenged the sufficiency of the evidence. Therefore, there is no double-jeopardy impediment to a new trial. *Beaman*, 229 Ill. 2d at 82.

### III. CONCLUSION

For the aforementioned reasons, we reverse the judgment of the trial court, and we remand the cause.

Reversed and remanded.